[Sac. No. 7817. In Bank. Nov. 20, 1967.]

HARVEY MORRIS, Plaintiff and Respondent, v. SPENCER
W. WILLIAMS et al., Defendants and Appellants.

Thomas C. Lynch, Attorney General, Walter J. Wiesner and Richard L. Mayers, Deputy Attorneys General, for Defendants and Appellants.

Peart, Hassard, Smith & Bonnington, Howard Hassard, Musick, Peeler & Garrett and James E. Ludlam as Amici Curiae on behalf of Defendants and Appellants.

Sheldon L. Greene, Clark F. Ide, George Bodle, Bodle & Fogel and James Ahern for Plaintiff and Respondent.

Wilke, Fleury, Sapunor & Hoffelt, Richard H. Hoffelt, Charles P. Scully, David B. Finkel, Bodle, Fogel, Julber & Reinhardt, George E. Bodle, Daniel Fogel, Stephen Reinhardt and Loren R. Rothschild as Amici Curiae on behalf of Plaintiff and Respondent.

SULLIVAN, J. — We are called upon to inquire into the validity of certain amended regulations of the Health and Welfare Agency reducing benefits provided under the California Medical Assistance Program, popularly known as Medi-Cal. Accordingly, as required by long established and unassailable California precedents, we h e r e discharge our responsibility to determine whether the Agency has acted in obedience to the mandate of the Legislature or has ignored or violated it. [1] Our function is to inquire into the legality of the regulations, not their wisdom. Nor do we superimpose upon the agency any policy judgments of our own. [2] Administrative regulations that violate acts of the Legislature are void and no protestations that they are merely an exercise of administrative discretion can sanctify them. They must conform to the legislative will if we are to preserve an orderly system of government.

As we shall explain, we have concluded that the regulations under review are violative of the pertinent law in two major respects: (1) by restricting physicians' services for recipients of public assistance without eliminating the medically indigent from the Medi-Cal program; and (2) by eliminating certain services entirely in the absence of a showing that proportionate reductions were not feasible to some extent. We hold that the trial court properly enjoined their implementation. We therefore affirm the judgment.

Plaintiff, a recipient of welfare assistance eligible for Medi-Cal benefits, commenced the instant class action on behalf of himself and all other persons eligible for assistance under the Medi-Cal program[1] for the purpose of challenging the

Note: The plural form ''plaintiffs'' has been used subsequently in the discussion of class issues.

[1]Plaintiff alleges that the members of such class are readily ascer-

validity of the regulations. Defendants[2] appeal[3] from the ensuing judgment declaring the regulations invalid and permanently enjoining their implementation.[4]

The Medi-Cal program is found in chapters 7 and 8 of part 3 of division 9 of the Welfare and Institutions Code (§ 14000 et seq.).[5] These statutes were enacted by the Legislature at the 1965 Second Extraordinary Session in order to establish a program of basic and extended health care services for recipients of public assistance and for medically indigent persons (§§ 14000 et seq., 14500 et seq.) and, by meeting the requirements of federal law, to qualify California for the receipt of federal funds made available under title XIX of the Social Security Act. An outline of the pertinent provisions of these statutes is essential to a grasp of the issues now presented to us.

## The Federal Statute

Title XIX, enacted by Congress in 1965 as Public Law 89-97, authorizes the Secretary of Health, Education and Welfare to make payments to states whose medical assistance programs meet the requirements of the statute. (42 U.S.C.A. § 1396.)[6] A state plan must cover individuals receiving aid or

tainable from the records of the Department of Social Welfare and the respective county welfare departments, but are so numerous as to make joinder impracticable; and that the issues of law and fact are common to all members of the represented class.

[2]Defendants are: Spencer W. Williams, Administrator of the Health and Welfare Agency (hereafter Administrator and Agency); Carel Mulder, Director of the Cailfornia Office of Health Care (hereafter Director of Health Care); and John Montgomery, Director of the State Department of Social Welfare (hereafter Director of Social Welfare).

[3]Defendants appealed to the Court of Appeal for the Third Appellate District. Upon the request of the parties and in view of the importance and urgency of the matter involved we ordered the cause transferred to this court. (Cal. Rules of Court, rule 20.)

[4]The judgment recites that such amended regulations are declared invalid pursuant to section 11440 of Government Code. That section, which is found in the Administrative Procedure Act (ch. 4, art. 5 of pt. 1 of div. 3 of tit. 2; and see § 11370), provides as follows:

''Any interested person may obtain a judicial declaration as to the validity of any regulation by bringing an action for declaratory relief in the superior court in accordance with the provisions of the Code of Civil Procedure and in addition to any other ground which may exist, such regulation may be declared to be invalid for a substantial failure to comply with the provisions of this chapter or, in the case of an emergency regulation or order of repeal, upon the ground that the facts recited in the statement do not constitute an emergency within the provisions of Section 11421(b).''

[5]Hereafter, unless otherwise indicated, all section references are to the Welfare and Institutions Code.

[6]42 U.S.C.A. section 1396 provides: ''For the purpose of enabling each State, as far as practicable under the conditions in such State, to

assistance under federally aided state programs for the aged, blind, disabled, and needy families with children; these groups must be treated equally. Persons who do not meet the income requirements for such aid or assistance may also be covered, but in "amount, duration, or scope" no greater than extended to cash recipients. (42 U.S.C.A. § 1396a(a)(10).)[7] A state must provide at least five categories of medical assistance: inpatient hospital services; outpatient hospital services; other laboratory and X-ray services; skilled nursing home services; and physicians' services, wherever furnished. (42

furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or permanently and totally disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary of Health, Education, and Welfare, State plans for medical assistance."

[7] 42 U.S.C.A. section 1396a provides in pertinent part: "(a) A State plan for medical assistance must— . . . (10) provide for making medical assistance available to all individuals receiving aid or assistance under State plans approved under subchapters I, IV, X, XIV, and XVI of this chapter, and—

"(A) provide that the medical assistance made available to individuals receiving aid or assistance under any such State plan— (i) shall not be less in amount, duration, or scope than the medical assistance made available to individuals receiving aid or assistance under any other such State plan, and (ii) shall not be less in amount, duration, or scope than the medical or remedial care and services made available to individuals not receiving aid or assistance under any such plan; and

"(B) if medical or remedial care and services are included for any group of individuals who are not receiving aid or assistance under any such State plan and who do not meet the income and resources requirements of the one of such State plans which is appropriate, as determined in accordance with standards prescribed by the Secretary, provide— (i) for making medical or remedial care and services available to all individuals who would, if needy, be eligible for aid or assistance under any such State plan and who have insufficient (as determined in accordance with comparable standards) income and resources to meet the costs of necessary medical or remedial care and services, and (ii) that the medical or remedial care and services made available to all individuals not receiving aid or assistance under any such State plan shall be equal in amount, duration, and scope; . . ."

The five subchapters mentioned in subparagraph (10) above are entitled respectively as follows: I (§ 301 et seq.)—Grants to States for Old-Age Assistance and Medical Assistance For The Aged; IV (§ 601 et seq.)—Grants To States For Aid And Services To Needy Families With Children; X (§ 1201 et seq.)—Grants To States For Aid To The Blind; XIV (§ 1351 et seq.)—Grants to States for Aid To The Permanently and Totally Disabled; and XVI (§ 1381 et seq.)—Grants To States For Aid To The Aged, Blind, Or Disabled, Or For Such Aid And Medical Assistance For The Aged.

U.S.C.A. §§ 1396a(a)(13),[8] 1396d(a)(1-5).[9]) The plan may not require any contribution by the individual towards payment for inpatient hospital services. (42 U.S.C.A. § 1396a(a)(14)(A).)

In addition to these and other specific requirements, the federal statute provides that the Secretary ''shall not make payments . . . unless the State makes a satisfactory showing that it is making efforts'' to broaden ''the scope of the care and services made available under the plan'' and to liberalize ''the eligibility requirements for medical assistance, with a view toward furnishing by July 1, 1975, comprehensive care and services to substantially all individuals who meet the plan's eligibility standards. . . .'' (42 U.S.C.A. § 1396b(e).)

### The California Statute

As previously stated, the Medi-Cal program provides for basic health care (ch. 7) and extended health services (ch. 8). It is the purpose of chapter 7 ''to afford basic health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons, including related social services which are necessary for those receiving health care under this chapter and Chapter 8 (commencing with Section 14500).'' (§ 14000, 1st par.) The Legislature expressed its intent to provide through chapter 7 ''for basic health care for those aged and other persons, including family persons who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the cost of such care would jeopardize the person or family's future minimum self-maintenance and security.'' (§ 14000, 2d par.) It also expressed its intent ''that the scope and duration of health services under this chapter and Chapter 8 (commencing with Section 14500)

---

[8] 42 U.S.C.A. section 1396a provides in pertinent part: ''(a) A State plan for medical assistance must— . . . (13) provide for inclusion of some institutional and some noninstitutional care and services, and, effective July 1, 1967, provide (A) for inclusion of at least the care and services listed in clauses (1) through (5) of section 1396d(a) of this title, and (B) for payment of the reasonable cost (as determined in accordance with standards approved by the Secretary and included in the plan) of inpatient hospital services provided under the plan; . . .''

[9] 42 U.S.C.A. section 1396d(a) lists such care and services as follows: ''(1) inpatient hospital services (other than services in an institution for tuberculosis or mental diseases); (2) outpatient hospital services; (3) other laboratory and X-ray services; (4) skilled nursing home services (other than services in an institution for tuberculosis or mental diseases) for individuals 21 years of age or older; (5) physicians' services, whether furnished in the office, the patient's home, a hospital, or a skilled nursing home, or elsewhere; . . .''

shall be at least equivalent to the level provided in 1964-65 under public assistance programs.'' (§ 14000.1.) ''Basic health care . . . may include diagnostic, preventive, corrective, and curative services and supplies essential thereto . . . for conditions that cause suffering, endanger life, result in illness or infirmity, interfere with capacity for normal activity including employment, or for conditions which may develop into some significant handicap.'' (§ 14059.) The specific categories of basic health care are those listed in the federal statute. (§ 14053, following 42 U.S.C.A. § 1396d.)

The Legislature authorized the Administrator of the Health and Welfare Agency to administer the program. Section 14105,[10] reenacted by chapter 104 of the 1967 statutes, contains the legislative mandate: ''The director [the Administrator of the Health and Welfare Agency, as defined in section 14060] shall prescribe the policies to be followed in the administration . . . [of the program] and the scope of the services to be provided, and may limit the rates of

---

[10]For convenience or reference, we set forth *in toto* the provisions of section 14105 as reenacted in 1967: ''The director shall prescribe the policies to be followed in the administration of this chapter and Chapter 8 (commencing with Section 14500) and the scope of the services to be provided, *and may limit the rates of payment for such* services, and shall adopt such rules and regulations as are necessary for carrying out, not inconsistent with, the provisions thereof.

''Such policies and regulations shall include rates for payment for services not rendered under a contract pursuant to Section 14104. Standards for costs shall be based on payments of the reasonable cost for such services.

''Insofar as practical, consistent with the efficient and economical administration of this part, the department shall afford recipients of public assistance free choice of arrangements under which they shall receive basic health care.

''In establishing the scope of services to be provided, the director shall provide for recipients at least for a minimum coverage as defined in Section 14056, and insofar as possible shall include other health care and related remedial or preventive services giving priority to those services which are considered to have the greatest value in preventing or reducing the likelihood of future high cost medical services.

''Notwithstanding the provisions of the preceding paragraph, and in accordance with the intent of this chapter and Chapter 8 (commencing with Section 14500), the director, with respect to medically indigent persons, may limit, by appropriate classifications, the number of medically indigent persons eligible, and may limit the scope and kinds of basic health care and extended health services to which such persons are entitled, to the extent necessary to operate programs under this part within the limits of appropriated funds. When and if necessary, such action shall be taken by the director with the advice of the Health Review and Program Council and in ways consistent with the requirements of the Federal Social Security Act.''

(The italicized portion was added by chapter 104 of the 1967 statutes as the only change in the original version of the section.)

payment for such services, and shall adopt such rules and regulations as are necessary for carrying out, not inconsistent with, the provisions [of the statute]. . . . Insofar as practical, consistent with the efficient and economical administration of this part, the department [the Health and Welfare Agency, as defined in section 14062] shall afford recipients of public assistance free choice of arrangements under which they shall receive basic health care. . . ."

Section 14105 further requires that "In establishing the scope of services to be provided, the director shall provide for recipients [of public assistance] at least for a minimum coverage"—defined by section 14056 as the five basic services required by 42 U.S.C.A. § 1396a(a)(13) (see fns. 8 and 9, *ante*)—"and insofar as possible shall include other health care and related remedial or preventive services giving priority to those services which are considered to have the greatest value in preventing or reducing the likelihood of future high cost medical services." Section 14152 expresses "the intention of the Legislature, whenever feasible, that the needs of recipients of public assistance for health care and related remedial or preventive services be met under the provisions of this chapter." Explicit priorities favoring recipients of public assistance over those whose "income and resources are comparable" are set forth in section 14006.5,[11] which provides that the "director shall reduce services in accordance with the priorities."

---

[11] Section 14006.5 provides: "Health care shall be provided, as soon as practicable under this chapter and Chapter 8 of this part, to persons and families who would, had they chosen to apply, have been considered as medically indigent and eligible for medical or other assistance under the state programs in effect in December 1965.

"Health care shall, within the limits of available funds and in accordance with federal law, be extended to other persons and families in accordance with the following priorities:

"(a) Public assistance recipients and persons and families who would be eligible for public assistance but for the fact that they do not meet the durational residence requirements prescribed for public assistance.

"(b) Persons and families whose income and resources are comparable to those in receipt of public assistance.

"(c) Persons and families whose income and resources are comparable to the standard for the medical assistance for the aged program in effect in December 1965.

"(d) Persons and families whose income and resources are comparable to the standard for the aid to the blind program in effect in December 1965.

"If sufficient funds are not available to provide health care for all of the persons enumerated in this section, the director shall reduce services in accordance with the priorities set forth in this section and in accordance with the provisions of Section 1902(a)(14) of the Federal Social Security Act."

Section 14105 provides also that the Administrator "may limit, by appropriate classifications, the number of medically indigent persons eligible, and may limit the scope and kinds of basic health care and extended health services to which such persons are entitled, to the extent necessary to operate programs under this part within the limits of appropriated funds. When and if necessary, such action shall be taken by the director with the advice of the Health Review and Program Council. . . ."

Additional standards for the Administrator's guidance are contained in chapter 1421 of the 1967 statutes, approved by the Governor and filed with the Secretary of State, August 25, 1967. The act is "an urgency statute" which took effect immediately "In order that the California Medical Assistance Program be permitted to operate at its present level, as contemplated by the Legislature." (Ch. 1421, § 3.) Medi-Cal expenditures from state sources for the fiscal year 1967-68 may not exceed $305 million, "except that with the approval of the Director of Finance additional amounts may be expended if they are obtained by transfer from other sources as authorized by the Legislature." (Ch. 1421, § 4.)

The new act adds section 14120 to the Welfare and Institutions Code, requiring the Administrator, with the approval of the Director of Finance, to "set up a monthly schedule of anticipated total payments and payments for physician services . . . for the fiscal year." (§ 14120, subd. (a).) "At any time the total amounts paid for physician services since the beginning of the fiscal year exceed by 10 percent the amounts scheduled to have been paid by that time, the administrator shall so inform the Director of Finance and at that time the administrator shall modify the method of payment of usual and customary fees to physicians to assure that the total amount paid for physicians' services in the fiscal year shall not exceed the total amount scheduled." (§ 14120, subd. (c).) Similarly, when *total* payments exceed by 10 percent the amount scheduled, the Administrator "within 30 days . . . shall institute program reductions which shall in his judgment assure that total payments in the fiscal year shall not exceed" available revenues. (§ 14120, subd. (d).)

Section 14103.7, also added by the new statute, provides that the Administrator, "when reducing services under this chapter [chapter 7] and Chapter 8 of this part in order to maintain the program within the fiscal limits fixed by the

Legislature, shall, to the extent feasible, make proportionate reductions in all services, rather than eliminating any service or services entirely.''

The Administrator must present a comprehensive report to the Legislature not later than January 31, 1968, including details of payment rates, program reductions, and ''expenditure reductions caused by program reductions'' for each type of service. (Ch. 1421, § 5(7).)

### The Regulations

Defendants adopted the challenged regulations as an emergency measure to take effect September 1, 1967. The emergency, as recited in the order of the Health and Welfare Agency, arose from the budget limitation of Medi-Cal expenditures in the 1967-68 fiscal year to $305 million. With the federal contribution added, and over-obligations from the previous fiscal year subtracted, approximately $600 million are available for program benefits in 1967-68. At existing rates of program expenditures, however, the total expenditures for the year would approximate $811 million. The emergency measure was designed to prevent the potential over-expenditure of $211 million by curtailing program benefits available under regulations in effect August 31, 1967.

Several of the changes restrict the scope of ''minimum coverage'' as defined in section 14056. Regulation 51305 of title 22, California Administrative Code, providing for physicians' services for recipients of public assistance is amended to *exclude* coverage for non-emergency surgery; routine care of nails, corns, and callouses; outpatient psychiatric care; eye refractions except after operations; pleoptics and orthoptics; hearing examinations for the purpose of hearing aid utilization; drugs administered by physicians except those listed in the state formulary; and services rendered beyond eight days in a private hospital or rehabilitation center except when approved by a Medi-Cal consultant. The same limitations on physicians' services are imposed upon the medically indigent under amended regulation 51403(a).

Inpatient hospital services are another category of ''minimum coverage'' modified by defendants' order. Amended regulation 51327(a), which applies to recipients of public assistance, limits these services to a maximum of eight consecutive days in a noncounty hospital, unless extended by a Medi-Cal consultant. Regulation 51405 applies the same limitation to the medically indigent.

Amended regulation 51307 limits dental services to ''the

relief of pain or the elimination of acute infection," and eliminates diagnostic and restorative dental services.

The services of chiropractors, spiritual healers, occupational therapists, psychologists, and audiologists are eliminated. Physical and speech therapy is covered "only when provided to an inpatient . . . under an arrangement whereby the cost of services are included in the payment formula of the institution." (Amended reg. 51309 (c).)

Discharge medications are limited to a maximum of 14 days' supply. (Amended reg. 51313.) Eliminated are prosthetic and orthotic appliances (reg. 51315), hearing aids (reg. 51319), and assistive devices (reg. 51321). Eyeglasses are covered "only for the initial restoration of adequate vision following extraction of the lens of the eye." (Amended reg. 51317.)

Home health care services are limited to 14 days and may be extended by the Medi-Cal consultant to a maximum of 30 days. (Amended reg. 51337.) Special duty nursing (reg. 51339) is eliminated.

### Findings of Fact and Conclusions of Law[12]

The trial court found so far as is here material that insufficient funds are available for expenditure during the 1967-68 fiscal year to finance the Medi-Cal program at the level provided for in the regulations prior to their amendment and at the level of health services provided in 1964-65 under public assistance programs; that the amended regulations delete as physicians' services, *inter alia,* psychiatric service (other than inpatient care) and eye refractions (except as necessary following extraction of the lens of the eye) for recipients of public assistance; that the amended regulations eliminated some health services entirely and did not make proportionate reductions in all such services; that the amended regulations do not exclude the medically indigent as defined in section 14005, subdivisions (b) and (c) and in portions of section 14006.5; that the Administrator did not provide explanations convincing to the court of the lack of feasibility of proportionate reductions in services;[13] and that curtailment of expenditure reasonably may be possible to permit proportionate reduction in service particularly in the

---

[12]The cause was advanced for hearing on the merits by stipulation of the parties.

[13]This finding contained the following: "The Court did indicate to the parties at the hearing that the burden of proof in this regard rested on the plaintiff."

utilization of public hospital facilities and in the establishment of fee schedules for providers where not now established.

The trial court concluded that the Administrator "properly cannot maintain" the Medi-Cal program at the expenditure level of the preceding fiscal year or at the 1964-65 level; that section 14000.1 has been modified by chapter 1421, particularly section 4 of the measure and section 14103.7; that section 14006.5 has been modified by chapter 104, statutes of 1967 and particularly section 14105; that chapter 1421, statutes of 1967 did not modify section 14006.5 or section 14105 (as reenacted in 1967); and that "the amended regulations by providing for the elimination of some services entirely and not proportionately, in the absence of explanation by the Administrator convincing to the Court of lack of feasibility, as heretofore found, are violative of section 14103.7 . . . and the amended regulations are invalid in this regard."

The court further concluded that "amended regulations by eliminating as physicians' services, certain psychiatric service and eye refractions do not provide for the minimum coverage for public assistance recipients as required by sections 14105, 14056 and 14053 . . . and the amended regulations are invalid in this regard"; and that the "amended regulations do not provide for the limitation of care for the medically indigent to the extent necessary to operate the program within the limits of appropriated funds as directed by section 14105 . . . as reenacted . . . and the amended regulations insofar as they reduce minimum coverage to public assistance recipients are invalid."

Judgment was entered accordingly. This appeal followed.

The parties' positions may be conveniently summarized as follows. Defendants' position may be analyzed as two principal assertions:

(1) That the amended regulations are valid under section 14103.7. Upon this issue, defendants urge that although the Administrator eliminated some services entirely instead of reducing all services proportionately, he acted within the discretion conferred by the statute to determine whether across-the-board reductions were "feasible." The record, they argue, supports as reasonable the Administrator's considered decision not to curtail expenditures by utilizing public hospitals or by establishing fee schedules for physicians. The trial court, however, improperly reviewed the Administrator's judgment not for abuse of discretion, but for correctness or wisdom. Moreover, defendants contend, the court's admit-

tedly misleading indication to the parties that the burden of proof on the "feasibility" issue rested on *plaintiffs*, taints the finding that *defendants* did not convincingly explain why proportionate reductions were unfeasible.

(2) That the amended regulations are valid under section 14105. The argument runs as follows: Although the Administrator reduced the "minimum coverage" for recipients of public assistance, he acted within the discretion conferred by the statute to define the scope of that coverage. Moreover, the statute permits him to meet budgetary limitations by restricting the basic five services without eliminating the medically indigent from the program. The record, defendants contend, supports as reasonable the Administrator's considered decision to limit coverage for physicians' services and not to curtail expenditures by striking the medically indigent. The trial court, however, erroneously construed the statute to preclude such a determination. If section 14105 does require elimination of persons before reduction of services, defendants urge that it should be deemed modified in that regard by section 14103.7, more recently enacted.

Plaintiffs' position consists essentially of four contentions:

(1) That the amended regulations violate section 14000.1 by reducing the "scope and duration of health services" below the level provided in 1964-65 under public assistance programs. Plaintiffs urge that the trial court erroneously concluded that section 14000.1 was modified by chapter 1421, Statutes of 1967; whereas section 3 of chapter 1421 recites the Legislature's intention, consistent with section 14000.1, that the program "be permitted to operate at its present level."

(2) That the amended regulations violate sections 14105, 14053, subdivision (5) and 14056, by reducing "physicians' services" for recipients of public assistance. Plaintiffs argue that the statute's general language mandates unqualified physicians' services; the Administrator may control their utilization by requiring prior authorizations, but may not reduce their scope.

(3) That the amended regulations violate section 14120 subdivision (c), added by chapter 1421, by failing to establish monthly schedules of payments for physicians' services. The Administrator thus illegally avoided his duty to "modify the method of payment of usual and customary fees" should payments exceed the scheduled amounts by 10 percent.

(4) That the amended regulations violate section 14103.7 by eliminating some services entirely. Upon this issue, the

argument runs as follows: The evidence presented at the hearing fails to show that the Administrator discharged his duty to determine whether proportionate reductions were "feasible." Material prepared *after* the hearing contains a superficial analysis of the problem. The record as a whole supports the finding that proportionate reductions "reasonably may be possible." Thus, plaintiffs contend, defendants failed to meet their burden of proving the contrary proposition.

Before proceeding to consider the parties' contentions, we deem it proper to delineate the scope of judicial review of the administrative actions plaintiffs attack. Under Government Code section 11373, "Each regulation adopted [by a state agency],[14] to be effective, must be within the scope of authority conferred. . . ." Whenever a state agency is authorized by statute "to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, *no regulation adopted is valid or effective unless consistent and not in conflict with the statute. . . .*" (Italics added.) (Gov. Code, § 11374.) Our first duty, therefore, is to determine whether the Administrator exercised quasi-legislative authority within the bounds of the statutory mandate. ■ While the construction of a statute by officials charged with its administration, including their interpretation of the authority invested in them to implement and carry out its provisions, is entitled to great weight, nevertheless "Whatever the force of administrative construction . . . final responsibility for the interpretation of the law rests with the courts." (*Whitcomb Hotel* v. *California Emp. Com.* (1944) 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405], and authorities there collected.) ■ Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations. (*Whitcomb Hotel* v. *California Emp. Com., supra*; *Hodge* v. *McCall* (1921) 185 Cal. 330, 334 [197 P. 86]; *Boone* v. *Kingsbury* (1928) 206 Cal. 148, 161-162 [273 P. 797]; *First Industrial Loan Co.* v. *Daugherty* (1945) 26 Cal.2d 545, 550 [159 P.2d 921]; see *Brock* v. *Superior Court* (1938) 11 Cal.2d 682, 688 [81 P.2d 934].)

■ If we conclude that the Administrator was empowered

14Government Code section 11000 in pertinent part provides: "As used in this title [title 2 "Government of the State of California"] 'state agency' includes every state office, officer, department, division, bureau, board, and commission."

to adopt the regulations, we must also determine whether the regulations are "reasonably necessary to effectuate the purpose of the statute." (Gov. Code, § 11374.) In making such a determination, the court will not "superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision." (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 832 [27 Cal.Rptr. 19, 377 P.2d 83] ; *Ray* v. *Parker* (1940) 15 Cal.2d 275, 311 [101 P.2d 665].) But we need not make such a determination if the regulations transgress statutory power. (*Whitcomb Hotel* v. *California Emp. Com., supra,* 24 Cal.2d 753, 759.) To put it another way, it is unnecessary for us to review administrative action for abuse of discretion, where we find no discretion was in fact conferred. With the foregoing principles in mind, we proceed to a consideration of the issues before us.

The trial court found, and defendants stipulated, that the amended regulations reduce Medi-Cal below the level of medical assistance provided under 1964-65 programs. (§ 14000.1.) The regulations thus contravene the legislative intent expressed in section 14000.1.

Chapter 1421 of the 1967 statutes provides for a maximum of $305 million in state funds for Medi-Cal in 1967-68. It is undisputed that the 1964-65 level of health care "scope and duration" cannot be maintained under that appropriation.

The Administrator is empowered to spend no more than the appropriated amount. His authority must therefore be measured by the annual budgetary provisions. Section 14000.1, by contrast, contains no mandate directed to the Administrator that defines his spending power. Rather, that section is directed to future Legislatures informing them of a principal long-term goal of Medi-Cal founders. The 1965 Legislature, of course, could not bind its successors and did not intend to do so. Nothing in section 14000.1 prevents the 1967 Legislature from establishing different goals or modifying old ones to accord with fiscal realities.

Plaintiffs urge, however, that chapter 1421 in its urgency clause reaffirms the objective of section 14000.1 by expressing the Legislature's "contemplation" that Medi-Cal "be permitted to operate at its present [1966-67] level." The Legislature, however, clearly contemplated that program reductions may be necessary to meet fiscal limitations. For that reason chapter 1421 contains numerous provisions for reduction and possible elimination of services, and requires the Administrator to report such actions by January 31, 1968. To focus on

the precatory language of the urgency clause is to miss the central impact of the act: that the limited appropriation may compel program cuts that would necessarily reduce the 1966-67 level.

The fact that the statute leaves open the possibility that additional funds may yet be authorized, in no way alters the responsibility of the Administrator to spend the appropriated amount only. The possibility of legislative relief is, in theory, always available. We agree with the trial court that the Administrator was entitled to proceed on the practical assumption that no further financial succor was forthcoming.

The first issue presented as to the propriety of the reductions is whether the Medi-Cal statute authorizes the Administrator to reduce the minimum coverage for recipients of public assistance (hereafter sometimes "recipients") without eliminating the medically indigent from the program.

The record reveals that the elimination of the medically indigent would produce a reduction of expenditures estimated at $145 million. The Director of Health Care testified that the regulations eschewed this method of reducing the estimated $210 million deficit on the ground that the counties would be forced to care for the medically indigent without the benefit of federal matching funds and with an injurious effect on local tax rates. Defendants contend that these reasons suffice to uphold their decision as a reasonable exercise of administrative discretion.

Federal law enables states to include medically indigent persons in medical assistance programs that qualify for federal grants. The inclusion of that group, however, is not required by federal law; a plan providing only for recipients of public assistance fully meets the qualifications of 42 U.S.C.A. section 1396a(a)(10). (See fn. 7, *ante*.)

Accordingly, California's Medi-Cal legislation includes coverage of persons not receiving public assistance whose income and resources are not sufficient to meet the cost of health care (§§ 14000; 14005;[15] 14006.5; 14051[16]), but

---

[15]Section 14005 in pertinent part provides that basic health care shall be provided "to any person who is a resident of the state and is: (a) A recipient of public assistance; or (b) A medically indigent adult person [of specified income] . . . ; or (c) A medically indigent family person in a family [of specified income]. . . ."

[16]Section 14051 provides: " 'Medically indigent person' means an aged or other person who is not currently receiving public assistance, but whose income and resources as defined by regulations are not sufficient to meet the cost of maintenance and health care or coverage."

clearly expresses priorities favoring public assistance recipients. (§§ 14006.5—see fn. 11, *ante*, 14105—see fn. 10, *ante*.) Section 14006.5 foresees the possibility that "sufficient funds" may not be available to provide "health care" for all persons initially covered. In that event, the Administrator "*shall* reduce services in accordance with the priorities set forth in this section. . . ." (Italics added.) Upon analysis, the designated priorities indicate general categories: First, persons receiving public assistance; and second, persons "whose income and resources are comparable" to those in receipt of public assistance or to the standards prescribed for other specified aid and assistance.

The clear preference for recipients of public assistance appears also in section 14105 (see fn. 10, *ante*), reenacted in 1967 with one change not relevant here. That section requires the Administrator to "provide for *recipients* at least for a minimum coverage"—the basic five services as defined in sections 14056 and 14053—and, "insofar as possible," other services, "giving priority to" preventive care. By contrast, the same section provides that the Administrator "*may* limit, by appropriate classifications, the number of *medically indigent* persons eligible, and *may* limit the scope and kinds" of health care to which they are entitled, "to the extent necessary to operate programs under this part within the limits of appropriated funds." (Italics added.)

The trial court determined that a conflict existed between the mandatory order of priorities established in section 14006.5, and the permissive language relating to the medically indigent in section 14105.[17] The court concluded

---

[17] The trial court's conclusion on this point is subject to another interpretation as well. It may be that the conflict found is between the first sentence of section 14006.5 (see fn. 11, *ante*), requiring that "Health care *shall be provided*" to a certain category of "medically indigent," and the last paragraph of section 14105, under which the Administrator "*may limit*" services provided to the medically indigent. (Italics added.) An examination of the record reveals, however, that the first sentence of section 14006.5 was never discussed by the parties or the court. Only that part of the section which sets forth priorities among eligible groups was argued below. In its memorandum opinion, the trial court phrased the question as "whether section 14006.5 and its system of priorities has been modified." The court's conclusion that the section has been modified, therefore, reasonably pertains to the system of priorities. The first sentence of section 14006.5 is in fact irrelevant to the issues in this case. It merely describes a category of eligible persons to be included in the program from its inception, continuing the eligibility criteria dealt with in the immediately preceding sections 14005 (see fn. 15, *ante*), 14005.1, 14005.2 and 14006. The eligibility of any group was not an issue before the trial court; the system of priorities among eligible groups was.

that section 14105 modifies section 14006.5 by virtue of recent reenactment. Nevertheless, the court held that by reducing minimum coverage for recipients without eliminating the medically indigent, the Administrator violated section 14105. We reach the same holding through a somewhat different analysis.

We find no conflict between sections 14006.5 and 14105. Both are part of the original Medi-Cal legislation, and the reenactment of the latter section in 1967 left unchanged its language relating to recipients of public assistance and to the medically indigent. Our examination of the two sections fails to convince us that they are "irreconcilable, clearly repugnant, and so inconsistent as to prevent their concurrent operation" (*Warne* v. *Harkness* (1963) 60 Cal.2d 579, 588 [35 Cal.Rptr. 601, 387 P.2d 377]; *California Drive-In Restaurant Assn.* v. *Clark* (1943) 22 Cal.2d 287, 292 [140 P.2d 657, 147 A.L.R. 1028]; see *People* v. *Harmon* (1960) 54 Cal.2d 9, 26 [4 Cal.Rptr. 161, 351 P.2d 329]) and that the settled presumption against repeal or modification by implication has been overcome.

Section 14006.5 indeed establishes a mandatory order of priorities for reducing services to the two groups of persons covered by the act.[18] Section 14105 specifies the manner in which the Administrator may act in following the priorities of section 14006.5. He "may limit" the number of the medically indigent eligible for any coverage; he "may limit" the coverage provided to those medically indigent who are eligible; and he "shall" seek the "advice" of the Health Review and Program Council when acting in either way. The "permissive" language of section 14105 means that the Adminis-

---

[18]Although the language of section 14006.5 is hardly a model of clarity, we are satisfied that the section establishes the priority of recipients of public assistance over the medically indigent. The low-priority group is described by the section as "Persons and families whose income and resources are comparable" to those in receipt of public assistance or to standards for other specified aid and assistance. A reference to "comparable standards" is found also in 42 U.S.C.A. section 1396a(a) (10)(B) (see fn. 7, *ante*) dealing with the group whose coverage is optional with the states. Since this group is *not* in receipt of public assistance, it can only be covered by the program at all if it consists of medically indigent (see §§ 14005 (fn. 15, *ante*), 14051 (fn. 16, *ante*)). The administrative regulations also refer to persons covered as two groups: Group I consists of recipients of public assistance, and Group II of medically indigent. Moreover, one of the trial court's findings refers to the "medically indigent as defined" in "portions of section 14006.5." This was also the parties' understanding. In fact, both counsel stated at oral argument that the section establishes the priorities as we have construed them.

trator may adopt one or more of these methods; the mandatory language of section 14006.5 means that he must adopt some. In short, section 14105 tells the Administrator what he may do about the medically indigent when section 14006.5 tells him to do something.

The event that triggers this duty under section 14006.5 is the insufficiency of funds to provide "health care" for all. Section 14105 requires that the basic five services be provided to recipients of public assistance. When the Administrator seeks to meet budgetary limitations by reducing the hard core of the program, the clearest case of insufficient funds under section 14006.5 appears.

The requirement of minimum coverage for recipients, moreover, constitutes an independent duty imposed on the Administrator. To discharge that duty faithfully, the Administrator must utilize every weapon the legislation makes available. Those weapons are the methods outlined in section 14105 for implementing the priorities of section 14006.5.

Since the Administrator reduced minimum coverage for recipients as well as for the medically indigent, it is obvious that his method of limiting care for the latter group did not enable him to provide full minimum coverage for recipients as required by section 14105. In these circumstances, the Administrator was bound to resort to the alternative method of eliminating some or all of the medically indigent. His failure to do so invalidates the amended regulations insofar as they reduce minimum coverage for recipients of public assistance.

Our holding upon this issue fully effectuates the legislative intent in accordance with a fundamental rule of statutory construction. (*Select Base Materials* v. *Board of Equalization* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *East Bay Garbage Co.* v. *Washington Township Sanitation Co.* (1959) 52 Cal.2d 708, 713 [344 P.2d 289]; *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 620 [7 Cal.Rptr. 129, 354 P.2d 657].) The Medi-Cal program combines previously disparate plans of medical assistance for recipients of public assistance. These persons, first and foremost, are the beneficiaries of the statutory scheme, and the Legislature intended that, whenever feasible, their needs be met. (§ 14152.) While a truly comprehensive program would provide fully for the medically indigent as well, they are given secondary status in both federal and state legislation. Their number is considerably smaller than that of

public assistance recipients;[19] and they have recourse at the county level if excluded from statewide coverage. There is no more justifiable occasion for invoking the power to exclude them than when fiscal difficulties threaten to undermine the right of public assistance recipients to receive the minimum coverage guaranteed by both state and federal laws.

█ Defendants contend, however, that they have discretion to define the content of ''minimum coverage,'' and that as long as a ''reasonable'' version of the basic five services is provided, the duty to provide ''minimum coverage'' is discharged. Thus, they argue, the Administrator may reduce physicians' services—the only one of the basic five at issue here—[20] when funds are in short supply without doing violence to the priorities established by the Legislature.

Section 14105 generally authorizes the Administrator to ''prescribe . . . the scope of the services to be provided'' and to adopt regulations ''not inconsistent'' with the provisions of the act. The same section, however, contains a specific mandate that *''In establishing* the scope of services to be provided, the director shall provide for recipients at least for a minimum coverage . . . .'' (Italics added.) This specific requirement clearly qualifies the general authority conferred by the section. Moreover, it constitutes a duty with which implementing regulations may not be ''inconsistent.''

We have no occasion upon this appeal to decide the meaning of ''physicians' services'' in some theoretical sense. We deal rather with the statutory mandate the Administrator must follow in the present circumstances of limited funds. The statute does not tell the Administrator that he may redefine physicians' services to meet financial needs. As we have indicated, the statute requires that he must curtail expenditures for the medically indigent before he reduces the minimum coverage afforded prior to the incipiency of a fiscal crisis. Such a reduction is plainly ''inconsistent'' with the priority provisions of the statute and therefore outside the authority conferred by section 14105.

[19]The number of medically indigent is estimated at 160,000 (Memorandum of Charles W. Stewart, Exhibit on Appeal), as compared with an estimated 1,358,200 recipients of public assistance (Medi-Cal Fiscal and Expenditure Program Summary, Exhibit on Appeal).

[20]The trial court indicated that the eight-day limit on private hospital services (followed by transfer to county hospital) was a ''control measure . . . not before me'' rather than a reduction of service. Since the regulations did not of their own force reduce the coverage under the drug formulary, the trial court did not pass on the validity of that restriction.

 It may be that minimum coverage must be reduced when even the elimination of the medically indigent fails to free sufficient funds. In that event, the reduction must accord with the provisions of section 14103.7 on "proportionate" reductions, which we discuss in detail below. Section 14103.7 contains no independent authorization to reduce services. Rather, it provides the method to be used *"when* reducing services under this chapter. . . ." (Italics added.) There is thus no conflict between sections 14105 and 14103.7, and no implied repeal of the former as urged by defendants.

 We now turn to examine the validity of the amended regulations under section 14103.7, which provides: "The Administrator . . . , when reducing services under this chapter . . . in order to maintain the program within the fiscal limits fixed by the Legislature, shall, to the extent feasible, make proportionate reductions in all services, rather than eliminating any service or services entirely."

Defendants stipulated at the hearing that some services were eliminated entirely and hence all services were not reduced proportionately, and the trial court so found. The sole issue for our determination, therefore, is whether the Administrator met the "feasibility" criterion of the statute.

As we have already pointed out, the trial court found that the Administrator failed to explain to the court's satisfaction why proportionate reductions were not feasible and also found that the utilization of public hospitals and the establishment of fee schedules for providers of medical assistance may possibly curtail expenditures "to permit" proportionate reductions. From these facts the court concluded that the amended regulations violate section 14103.7.

The Director of Health Care testified at the hearing that, on a statewide basis, there are sufficient facilities in county hospitals (7,000 beds) to accommodate the 5,000 recipients of assistance who require inpatient services at any given time, and that per diem charges of county hospitals are typically lower than those of private hospitals. He agreed that the use of county hospital facilities would result in a saving, and that these facilities were used to care for recipients prior to the Medi-Cal program.

In response to a question by the court, the witness explained that utilization of county hospitals was rejected on two grounds: reluctance to consign recipients to treatment in facilities "traditionally reserved for the poor," and fear of

interruption in continuity of care by physicians having no staff privileges at county hospitals.

With respect to establishing fee schedules for physicians, the witness testified that the possibility was rejected in order to give effect to "an expressed preference" in the law for payment of "usual and customary" fees.

Section 14103.7 was added by chapter 1421 of the 1967 statutes to guide the Administrator in tailoring the program to meet appropriated funds. The 1967 Legislature, while fore-seeing that reductions in services may be inevitable, hoped that the program could be permitted to operate at its 1966-67 level, to wit, without reductions in services (ch. 1421, § 3). If reductions could not be avoided, the Legislature mandated that, "to the extent feasible," they be made proportionately in all services. The record is woefully deficient in evidence on the meaning of proportionality of reductions in services that cannot be qualitatively compared. It is not clear whether pro-portionality of reductions means a strictly uniform percent-age cut in the expenditures for all services, or merely partial reductions in varying degrees. It is clear, however, that the challenged regulations accord with no possible meaning of the term insofar as they eliminate some services entirely.

The record establishes that the elimination of certain serv-ices was undertaken because proportionate reductions in all services were not expected to produce the savings needed to meet budgetary limitations. If the deficit could be narrowed by economy measures unrelated to cuts in services, however, proportionate reductions in services may then result in enough savings to avoid the elimination of any service. It is in this context that the trial court suggested the possibility of cutting costs through the utilization of public hospitals and the establishment of fixed fees for physicians. Defendants obviously agreed that such factors were relevant in deter-mining the possibility of compliance with the mandate of section 14103.7, for they considered (and rejected) the very measures the trial court suggested. They contend that their decision in this respect was made in reasonable exercise of discretion under the statute.

However, it is the duty and responsibility of the courts to examine statutes with care to ascertain that the Legislature indeed intended to subject administrative action to the nar-row scope of review that discretion occasions (see *Pitts* v. *Perluss, supra,* 58 Cal.2d 824, 832), and to identify with par-

ticularity the areas, if any, truly within administrative discretion.

Section 14103.7, by requiring proportionate reductions *"to the extent* feasible" (italics added), confers no discretion upon the Administrator to decline to follow its mandate if proportionate reductions are "feasible" *to some extent*. The Administrator must therefore use every "feasible" means of curtailing expenditures in an effort to reduce the deficit so that no service need be eliminated. He has discretion to select the means to be utilized if not all are necessary to produce the necessary savings. Moreover, whether a particular measure is "feasible" is initially for the Administrator to determine. But his determination must be based on factors that the statute, as interpreted by the courts, permits him to weigh. He has no discretion to decline to adopt an economy measure, not specifically proscribed by law, on grounds unrelated to curtailment of expenditures. "Feasible," in short, means capable of being done and capable of producing a saving in a manner not otherwise barred by the statute.

We articulate the foregoing definition in the light of the full substance of the statute. (*Wallace* v. *Payne* (1925) 197 Cal. 539, 544 [241 P. 879] ; *City of San Diego* v. *Granniss* (1888) 77 Cal. 511, 517 [19 P. 875].) Any other construction of "feasibility" would fail to take cognizance of the overriding purpose of the 1967 legislation to provide the most comprehensive care possible under emergency fiscal conditions. The Legislature was aware that the limited appropriation may necessitate curtailment of expenditures that served useful purposes. The 1965 Legislature preferred, for example, that "In determining the reasonable charge for a physician's services, there shall be taken into consideration the customary charge for similar services generally made by the physician, as well as the prevailing charges in the locality for similar services" (§ 14104, subd. (c)6). But the 1967 Legislature in reenacting section 14105, as the only change in the provision, added authority for the director to "limit the rates of payments" for services. (See fn. 10, *ante.*) By chapter 1421, moreover, the same Legislature added section 14120 *requiring* the Administrator to "modify the method of payment of usual and customary fees to physicians" when the amount paid exceeds by 10 percent the amount scheduled to be paid.

These recent enactments indicate to us that the Legislature intended to compromise the customary fee principle if neces-

sary. Section 14103.7 indicates that the Legislature intended to avoid elimination of services "to the extent feasible." In combination, these provisions justify fixing physicians' fees as a method of preventing the elimination of services. The same principle supports the conclusion that utilization of county hospitals is a "feasible" measure within the meaning of section 14103.7. Although there is a legislative preference for free choice of facilities (§§ 14000, 14000.2), this policy is required only "Insofar as practical, consistent with the efficient and economical administration" of the program (§ 14105). The Administrator in fact compromised the policy by promulgating the eight-day limit for private hospital services. The evidence supports the trial court's conclusion that more drastic measures along similar lines may result in a saving and thus qualify as "feasible" under section 14103.7.

We do not decide that the Administrator must utilize either or both of these measures. He may institute others that would meet the requirements of section 14103.7. In particular, we reject plaintiffs' contention that the Administrator has violated section 14120 by failing to establish schedules for physicians' fees and thus avoiding the duty to reduce fees when payments exceed the scheduled amount. The Director of Health Care testified that the pendency of the action made it impossible to prepare monthly schedules, because until the court determined which services must be provided, there was no sound basis upon which to base monthly schedules of anticipated payments for services. In view of the fact that the legislation was enacted only two weeks prior to the hearing, the Director's explanation provides a plausible ground for suspending implementation of the mandate of section 14120. We conclude that the evidence supports the trial court's finding that the Administrator failed to explain why proportionate reductions were not feasible. The amended regulations therefore violate section 14103.7 insofar as they eliminate certain services entirely.

Defendants contend that the trial court misled them by indicating that the burden of proof on the issue of nonfeasibility rested on plaintiffs. As we have pointed out, the hearing below, by stipulation of the parties in open court, was a trial on the merits. Plaintiffs, proceeding upon their amended complaint in two counts,[21] sought a permanent injunction and a

---

[21] By leave of court, plaintiffs filed such amended complaint at the commencement of the hearing and by stipulation of the parties its material allegations were deemed denied by defendants.

declaratory judgment that the amended regulations were invalid. (Gov. Code, § 11440.) The sole witness was defendant Carel Mulder, Director of the Office of Health Care. Plaintiffs called Mr. Mulder as an adverse witness (Evid. Code, § 776). At the conclusion of such cross-examination of Mr. Mulder, defendants' counsel stated that before proceeding he would "like to address an inquiry as to the Court as to the *sharing of the burden* of going forward here. . . . I wonder if at this point it would be appropriate for the Defendant to move for a nonsuit or whether you desire me at this time to inquire of Mr. Mulder on these areas which would be similar, to clarify these issues for the Court?" (Italics added.) The court replied: "Well, I don't think there's any basis for nonsuit in this matter. It primarily is a matter of law."

A colloquy ensued among counsel and the court on the subject of the feasibility language in section 14103.7. The court remarked that if such section was applicable "it seems to me we should either *by affidavit* or *through testimony* have something with respect to the meaning of the feasibility language in Section 14103.7 as added by Senate Bill 1065. . . . Now, I think Mr. Meyers, on this that this is the Plaintiffs' burden and unless something is produced, why, it isn't produced, period. I see no reason why you have to go into that." (Italics added.) The court then stated, apparently in response to an interruption by plaintiffs' counsel, "let me hasten to assure you that I regard that as really short of a relatively minor point, because I think basically we are talking about law."[22] Apparently because of these remarks of the court plaintiffs' counsel further questioned Mr. Mulder. Defendants' counsel then took the witness on redirect examination[23] after which plaintiffs' counsel took the witness on recross-examination. This completed the testimony. Counsel for both parties then proceeded to introduce various affidavits subject to a reserved motion to strike.

It would therefore appear that all testimony in the case was

[22]In further explanation, the court stated that "the question is a very simple one. Why, Mr. Mulder, was it not feasible to make proportionate reductions in all services rather than eliminating certain services entirely?"

[23]The remarks of defense counsel at this point are significant. "Well, I've been waiting for the last half hour for the question that your Honor suggested he ask, although I don't think it's the obligation of the Defendant to do this, I think in the purpose of clarity and to get on with it—— THE COURT: If you don't ask it at this point, I'm going to ask it."

introduced during the plaintiffs' case in chief. The record fails to disclose that either of the parties formally rested at any point. Nor does it disclose that defendants made a motion for nonsuit at any point. Instead, after affidavits had been offered by both parties, counsel for each of them stated that there was ''nothing further at this time.'' After statements by each of the counsel on the legal issues, both counsel indicated their agreement that the court ''close the hearing.'' The court then took the matter under submission. Fairly read the record discloses that counsel did not pursue, nor did the court insist upon, all of the usual trial procedures; rather both counsel appeared to have been desirous of presenting, and the court of receiving, all competent and material evidence which might assist the court in resolving the problem before it.

Subsequently the court in its memorandum opinion indicated that defendants failed to meet the burden on the issue of nonfeasibility under section 14103.7. Defendants then protested that they had been misled, and proffered material in part prepared subsequent to the hearing purporting to explain the reasons for the adoption of the regulations.

We have no doubt that the burden of going forward with the evidence on the issue of nonfeasibility properly belonged to defendants. Although a plaintiff ordinarily has the burden of proving every allegation of the complaint and a defendant of proving any affirmative defense, fairness and policy may sometimes require a different allocation. (See Evid. Code, § 500.) Where the evidence necessary to establish a fact essential to a claim lies peculiarly within the knowledge and competence of one of the parties, that party has the burden of going forward with the evidence on the issue although it is not the party asserting the claim. (*Garcia* v. *Industrial Acc. Com.* (1953) 41 Cal.2d 689, 694 [263 P.2d 8]; 9 Wigmore, Evidence (3d ed. 1940) § 2486; Witkin Cal. Evidence (1958) § 56(b).) Clearly only defendants could explain why they deemed proportionate reductions not feasible, and the burden on this issue was theirs.

Defendants' proper remedy for raising the point now made was by motion to reopen following submission of the cause, supported by affidavit showing good grounds. (*Shimpones* v. *Stickney* (1934) 219 Cal. 637 [28 P.2d 673]; *Eatwell* v. *Beck* (1953) 41 Cal.2d 128 [257 P.2d 643]; *Foster* v. *Keating* (1953) 120 Cal.App.2d 435, 451 [261 P.2d 529].)

Having failed to assert error properly below, defendants are precluded from raising the matter at this stage of the proceeding. (*Damiani* v. *Albert* (1957) 48 Cal.2d 15, 18 [306 P.2d 780] ; *Horn* v. *Atchison T. & S.F. Ry Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561].)

Assuming *arguendo* that the contention is properly before us, we are convinced that despite the trial court's unfortunate language, defendants should have known that the burden rested on them. As part of their case, plaintiffs showed that the regulations eliminated certain services entirely, and that arguably "feasible" methods for achieving proportionate reductions were available. As we have pointed out, the court indicated that plaintiffs had established a prima facie case and that a motion for nonsuit would fail. Defendants did not make that motion. Defendants' counsel in fact examined the Director of Health Care and had the opportunity to elicit the information defendants now claim that witness could have produced. As we have explained, we think counsel for both parties strove conscientiously to provide the court with all available evidence either through oral testimony or by affidavit and at the conclusion of their efforts both clearly indicated to the court that it could "close the hearing."

Defendants subsequently submitted material containing additional information and, although not properly in evidence, these exhibits are filed with the record on appeal. We have examined them and we find that the information they contain would in all likelihood have been deemed irrelevant under the test of feasibility set out in this opinion.

In sum, we cannot say that defendants were prejudiced in the presentation of their case.

We reach these conclusions: (1) Neither section 14000.1 nor the urgency clause found in section 3 of chapter 1421, Statutes of 1967, prohibits reductions in services that accord with the directives of the relevant statutory provisions. (2) The amended regulations violate the mandatory requirements of sections 14006.5 and 14105 by restricting physicians' services for recipients of public assistance without eliminating the medically indigent from the Medi-Cal program. (3) The amended regulations violate section 14103.7 by eliminating certain services entirely in the absence of a showing that proportionate reductions were not "feasible" to some extent.

The judgment is affirmed.

Traynor, C. J., Peters, J., Tobriner, J., and Mosk, J., concurred.

McCOMB, J.—I dissent. I would reverse the judgment of the trial court. Our government is divided into three branches: Legislative, Executive and Judicial, and this court should not invade the powers of the legislative or executive branches of the government, which in my opinion has been done by the majority opinion in the instant case. It is not the business of this court to pronounce policy. Self-restraint is of the essence of the judiciary. Our Constitution does not authorize the court to sit in judgment on the wisdom of the actions of the legislative or executive branches of the government.

The superior court entered judgment enjoining defendants from implementing certain emergency regulations, the net effect of which was to reduce the level of services provided under the Medi-Cal Program, effective September 1, 1967. The emergency regulations represented the Administrator's decision as to how outgo under the Medi-Cal Program should be brought into balance with the monies which had been appropriated by the 1967 Legislature.

The superior court agreed that outgo had to be balanced with the available funds but held nevertheless that the Administrator had gone beyond the authority granted to him by the Legislature when he carried out the quasi-legislative duty of adopting the challenged regulations.

The issue presented is whether defendants' emergency regulations are valid. An examination of the legislative and administrative background may prove helpful in evaluating the issue and considering the applicable law.

*Legislative and Administrative Background*

A. *The Decision to Provide Mainstream Medical Care for the Poor—The Medi-Cal Program.*

In 1965 the United States Congress enacted Public Law 89-97. the Social Security Amendments of 1965. This law added title XIX to the Social Security Act and contained the provisions of what is now referred to as the Federal Medicaid Program. Title XIX broadened the provisions of the Kerr-Mills Program for the aged, extended its provisions to additional needy persons, and allowed the states to combine within a single uniform program various medical services for the needy previously authorized by five separate titles of the Social Security Act. Title XIX extended the advantages of an

expanded medical assistance program to the aged who are indigent, and to needy individuals in programs for dependent children, to the blind, and to the permanently and totally disabled. In addition, title XIX contained provisions allowing coverage of persons who would qualify under the named programs if in sufficient financial need. These latter provisions have been described as the most far-reaching provisions of the new legislation insofar as they are designed to bring the benefits of modern medical care to all needy people, a group referred to herein as the medically indigent or medically needy as defined in subdivisions (b) and (c) of section 14005 of the Welfare and Institutions Code.[1]

California's Medi-Cal Program, as contained in chapters 7 and 8 of division 9 of the Welfare and Institutions Code, section 14000 et seq., was adopted by the 1965 Second Extraordinary Session of the Legislature and constitutes California's effort to take advantage of the provisions of title XIX. This was an emergency measure effective November 15, 1965, which became operative on March 1, 1966. The measure repealed the prior provisions relating to medical care for public assistance recipients and medical care for the aged. It established in their place a program of basic and extended health benefits for public assistance recipients and medically indigent persons.

At the time this legislation was adopted, the Legislature did not have sufficient information with which to gauge the extent or scope of the program it was approving in principle, nor did it have adequate data upon which to make a sound estimate of the probable costs of the program. The Legislature's general intent, however, was clear. It wished to establish a broad program of medical services that would capture as much of the federal matching funds available as possible, without exceeding the state and county funds that had been made available for this purpose in the immediately preceding year. (§ 14010.)

The Legislature also indicated its purpose and intentions when it adopted the program. Thus, section 14000 provides: "The purpose of this chapter is to afford basic health care and related remedial or preventive services to recipients of public assistance and to medically indigent aged and other persons, including related social services which are necessary

---

[1] All section references herein are to the Welfare and Institutions Code except as hereinafter noted.

for those receiving health care under this chapter and Chapter 8 (commencing with Section 14500).

"The intent of the Legislature is to provide, to the extent practicable, through the provisions of this chapter, for basic health care for those aged and other persons, including family persons who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care would jeopardize the person or family's future minimum self-maintenance and security. It is intended that whenever possible and feasible:

"(a) After December 31, 1966, such care shall, to the extent feasible, be provided through a system of prepaid health care or contracts with carriers;

"(b) The means employed shall be such as to allow eligible persons to secure basic health care in the same manner employed by the public generally, and without discrimination or segregation based purely on their economic disability.

"(c) The benefits available under this chapter shall not duplicate those provided under other federal or state laws or under other contractual or legal entitlements of the person or persons receiving them.

"(d) In the administration of this part and in establishing the means to be used, the department shall give due consideration to the appropriate organization and to the ready accessibility and availability of the facilities and resources for basic health care and extended health services to persons eligible under this chapter and Chapter 8.

"It is also the intent of the Legislature that, except in accordance with the provisions of Section 14010, and as necessary to secure federal approval of a plan under Title 19 of the Federal Social Security Act, until January 1, 1967, care shall, to the extent feasible, be limited to persons and families who would, had they chosen to apply, have been considered as medically indigent and eligible for medical or other assistance under the state programs in effect in December 1965."

The concept set forth in section 14000, subdivision (b), expresses the legislative intent to provide "mainstream" medical care to the poor. In other words, the program is intended to provide medical care comparable to that made available to those economically able to pay for average, competent medical care. The Legislature also indicated its intent that the scope and duration of health services provided under the Medi-Cal Program should at least be equivalent to the level provided in 1964-1965 under the then existing public

assistance programs. (§ 14000.1). It indicated an intent that county hospitals integrate their services "with those of other hospitals into a system of community service which offers free choice of hospitals to those requiring hospital care" in order to "eliminate discrimination or segregation based on economic disability." (§ 14000.2; see, also §§ 14006.5, 14104, 14105.)

B. *Fiscal Implications of the Above Decision and the 1967 Fiscal Crisis.*

By the spring of 1967, if not earlier, it was fully apparent that the cost of the Medi-Cal Program was far exceeding the state funds appropriated for the program. Committees of the 1967 Legislature held hearings on this financial problem. These hearings resulted in legislation (specifically chapter 1421) designed to furnish guidelines for reductions in the program.

Chapter 1421, Statutes of 1967, was an urgency measure that became effective on August 25, 1967. The measure did many things—all in an obvious response to the fiscal crisis faced by the Medi-Cal Program:

1. It added section 14103.7, which provides: "The Administrator of the Health and Welfare Agency, when reducing services under this chapter and Chapter 8 of this part in order to maintain the program within the fiscal limits fixed by the Legislature shall, to the extent feasible, make proportionate reductions in all services, rather than eliminating any service or services entirely."

2. It added section 14120, which requires the establishment of a monthly schedule of anticipated billings, and, within the framework of that schedule, requires the Health and Welfare Agency Administrator to institute program reductions whenever the total exceeded by 10 percent the amount scheduled to have been paid by that time, and to modify the usual and customary physicians' fees whenever such fees exceed by 10 percent the amount scheduled for that segment of the program.

3. By amending the next to last sentence of section 14157, the Legislature closed the appropriations for the current fiscal year at $305 million. This limitation is made explicit by the provisions of section 4 of the bill, which provides: "Expenditures from state sources under the medical assistance program for the fiscal year 1967-1968 shall not exceed three hundred five million dollars ($305,000,000), except that with the approval of the Director of Finance additional amounts may

be expended if they are obtained by transfer from other sources as authorized by the Legislature.''

4. By adding section 14158, the measure requires the institution of normal budgetary procedures for 1968-1969 and following years instead of prior continuing appropriations.

5. By section 5, the measure requires the Health and Welfare Administrator to report to the Legislature not later than January 31, 1968, showing total program costs, total program reductions and other data.

6. The measure also implements a modified accrual accounting system in which expenditures in a given fiscal year are evidenced by billings received rather than obligations incurred. Such a system will permit bills incurred but not yet received by June 30, 1968 (estimated to amount to $53 million in this fiscal year) to be charged against the revenue of the succeeding rather than the current fiscal year.

Thus, it seems apparent that the purpose of the 1967 legislation, as contained in chapter 1421, differed significantly in both its tone and objectives, from the initial legislation adopted in 1965 establishing the program. The original legislation had as its objective the rapid establishment, development and expansion of the program designed to provide mainstream medical care to the poor. The 1967 legislation was designed to solve a fiscal crisis by providing guides for program cuts.

The 1967 emergency regulations that were adopted eliminated some types of physicians' services that had previously been provided to public assistance recipients; for example, psychiatric services (other than in-patient care) and eye refractions (except as necessary following extraction of the lens of the eye). The regulations also eliminated certain services in those cases where defendants determined that a proportionate reduction in such services had been demonstrated to be totally impracticable (and therefore not feasible) or else so at variance with a logical offering of medical care as to render such reductions untenable.

As indicated above, the ultimate issue herein is the validity of the emergency regulations. The Legislature intended that the Administrator rely upon his intimate knowledge of the program and adopt regulations designed to balance expenditures with available funds. In my opinion, the law does not require the Administrator to eliminate entire groups of persons (i.e., the medically needy) from the Medi-Cal Program

before it permits reducing the level of services available to all.

The emergency regulations involved herein were adopted by the Administrator in accord with the provisions of the California Administrative Procedure Act. (Gov. Code, § 11370 et seq.) There is no procedural question presented; rather, the question is the substantive one of the propriety of the Administrator's quasi-legislative action in adopting the emergency regulations which he did adopt.

When courts review quasi-legislative administrative action, they are limited to determining whether the quasi-legislator has taken action which was "arbitrary, capricious, or entirely lacking in evidentiary support, or whether he has failed to follow the procedure and give the notices required by law." (*Brock* v. *Superior Court,* 109 Cal.App.2d 594, 605 [8] [241 P.2d 283].)

This problem of the scope of review when an administrative regulation is challenged has been presented to the California appellate courts in a number of different cases. (See, e.g., *Pitts* v. *Perluss,* 58 Cal.2d 824 [27 Cal.Rptr. 19, 377 P.2d 83]; *Ray* v. *Parker,* 15 Cal.2d 275 [101 P.2d 665]; *Brock* v. *Superior Court, supra,* 109 Cal.App.2d 594 [241 P.2d 283]; *Vita-Pharmacals, Inc.* v. *Board of Pharmacy,* 110 Cal.App.2d 826 [243 P.2d 890].)

In *Ray* v. *Parker, supra,* this court discussed generally the problem of judicial review of quasi-legislative acts and, after reviewing numerous federal cases, concluded that due process requirements were satisfied and that the order was valid. The rule as to the scope of review was stated as follows: ". . . In an action of this character challenging proceedings and hearings of the type here involved, it is not for the courts to *weigh* the evidence and data adduced before and considered by the director preliminary to his issuance of the several orders here challenged. Under the circumstances here present, judicial interference should occur only when it can be said that administrative action has been arbitrary and capricious. (Citations.)" (15 Cal.2d at 310-311 [23].)

In *Pitts* v. *Perluss, supra,* this court discussed the reasons for the rule and succinctly summarized it by stating: "We confront a situation here which graphically illustrates the wisdom of the general rule that the court should not substitute its judgment for that of an administrative agency which acts in a quasi-legislative capacity. All of the parties to this litigation recognize the intricate and technical nature of the

subject matter as well as the expertise and full technical knowledge which its administration requires. It would be presumptuous of a court to claim such skill; it will not, therefore, superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision.

"The decisions do not sustain the insurers' contention that in determining the validity of the regulation this court should exercise its independent judgment and reweigh the proffered evidence. While such a test may apply to the review of the adjudicatory or quasi-judicial rulings of certain agencies (Code Civ. Proc., § 1094.5) it does not pertain to the review of regulations rendered by an agency in its quasi-legislative capacity. As to the quasi-legislative acts of administrative agencies, 'judicial review is limited to an examination of the proceedings before the officer to determine whether his action has been arbitrary, capricious, or entirely lacking in evidentiary support, or whether he has failed to follow the procedure and give the notices required by law.' (Citations.)" (58 Cal.2d at 832-833.)

The same reasoning and rule are equally applicable here. The regulations are a reasonable attempt to carry out the legislative mandate to balance expenditures with available funds. In order to arrive at a combination of actions which would best carry out the legislative direction to balance program benefits with available funds, a wide variety of alternatives was examined. Furthermore, the Administrator had to consider not only the fiscal crisis but also the following points:

1. Time was of the essence, as each day added to the severity of the necessary cuts; reductions had to produce savings during 1967-1968;

2. Presently available staff at state, county, and fiscal intermediary levels had to suffice for carrying out actions;

3. Attempts to effect "proportionate" percentage reductions had to be considered in the light of the legislatively expressed purpose to achieve a program that was medically and remedially reasonable; and

4. The "Basic Five"[2] costs had to be limited since by themselves they exceeded available funds.

In his testimony Mr. Mulder outlined some of the relevant

---

[2]The "Basic Five" are the first five items listed in section 14053. They are physicians' services, hospital inpatient services, hospital out-patient services, nursing home care, and laboratory and X-ray services. They are also sometimes referred to as the "minimum coverage" because of the provisions of section 14056.

factors that were considered in arriving at decisions concerning the form and scope of the program reductions finally decided upon. Also helpful is the affidavit of Mr. Stewart (the Deputy Director of the Office of Health Care Services) which has attached to it an exhibit and a document entitled ''Medi-Cal Fiscal and Expenditure Program Summary 1967-68 Fiscal Year.'' This latter document constituted the agenda submitted to the Health Review and Program Council at its August 4 and 11 special meetings. Although Mr. Stewart's affidavit, as well as Exhibit A attached to that affidavit, was prepared subsequent to the hearing in the superior court, the materials are not after-the-fact rationalizations. Rather, Exhibit A is a summary of the various factors that were previously considered by the Administrator and were in the Medi-Cal Program Summary considered by the Health Review and Program Council a month prior to the court hearing in this matter.

Exhibit A and the agenda submitted to the Health Review and Program Council contain materials which discuss the possible alternative program cuts that were considered and indicate the many possible ways in which reductions could have been achieved. The affidavit and the exhibits thereto plainly indicate that there were sound reasons for reducing the program in the manner reflected by the emergency regulations rather than in some other manner. In Mr. Stewart's affidavit he discussed the feasibility of proportional cuts and outlined various reasons for the conclusion that such cuts were not feasible. For example, a uniform percentage cut would need to be so deep that it would effectively eliminate some services; a reduction in nursing home care or hospital care by 26 percent (which would have been approximately the percentage reduction required on an across-the-board basis) would in effect deny such services; and an across-the-board reduction in physicians' fees was ''not considered compatible with continued participation of an adequate number of physicians.'' It was concluded that ''to effect proportionate cuts, deeper inroads would have to be made in physicians' and out-patient clinic services than just the elimination of non-emergent [sic] surgery and psychiatric care. Without question preventive medical services would have to be disallowed. To reduce hospital and nursing home care proportionately, i.e., 25 to 30 percent, arbitrary, absolute, and unreasonable limits would have to be set on length of stay, either generally or by diagnosis, but in

either case without flexibility to meet the needs of the individual patient. . . . Obviously, there is no way of arranging to allow for 25 percent of necessary laboratory and x-ray services other than through a deductible [plan] or [by requiring] co-payment which welfare recipients could not afford."

Mr. Stewart refers to the fact that a proportionate reduction in some services could only result in ridiculous situations. "There can be nothing 'feasible' in any eye examination without the needed eyeglasses, and 75 percent of a pair of eyeglasses is difficult to provide. The same applies to hearing examinations and hearing aids, to tooth extractions and dentures, and to therapy evaluation and therapy services."

Thus, the Administrator concluded that "[w]here only a partial cut could be made—such as, home health care, dental care, podiatry, transportation, and drugs—it was done in order to provide as medically feasible a program as was possible."

It is apparent from the above and from the statistical presentation that no combination of actions affecting services was found to be adequate to reduce costs without also reducing the Basic Five services. Moreover, actions affecting caseload or the number of persons covered, including the elimination of the medically needy group, were examined and discarded as being contrary to the best interests of the state as a whole.

All the above-mentioned alternatives were presented to the Health Review and Program Council at special meetings held on August 4 and 11, 1967. Testimony was also received from many organizations and individuals. After reviewing and weighing all these considerations the Health Review and Program Council and the Office of Health Care Services staff recommended that the September 1, 1967, emergency regulations be adopted as the most reasonable and humanitarian method of balancing expenditures with the available funds.

The challengers did suggest alternative means of cutting expenditures by restrictions on physicians' fees and by imposing a requirement of hospitalization in county hospitals. As indicated above, one of the alternatives considered by the Administrator and his staff was a fixed fee schedule for physicians' services. However, it was concluded that this would be disadvantageous in that it would reduce participation of physicians and impair present medical society controls of utilization and quality. Similarly, insofar as the county hospital alternative was concerned, the record reflects consideration of this point and some of the problems involved such as (a) the

inadequate number of county hospital beds, (b) the problem of providing hospitalization in locations where county hospitals did not exist, and (c) the fact that a requirement of county hospitalization would represent a major change from the mainstream medical concept embodied in section 14000. The suggestions made by plaintiffs constitute alternatives that were considered and rejected by defendants as infeasible.

In the light of the record the Administrator was amply justified in exercising his discretion and accepting the judgment of his professional staff. Accordingly, his actions and the regulations cannot reasonably be characterized as arbitrary, capricious, or without support in the record. The trial court itself refused to make such a finding when it rejected defendants' proposed Conclusion of Law.

In the absence of such a finding, such regulation is valid and proper. This does not mean the regulations should be held to be perfect or that their substance need be approved by this court. In *Pitts* v. *Perluss, supra,* 58 Cal.2d at page 846, we stated: ''Against the backdrop of the legislation and the director's execution of its policies, the regulation was neither arbitrary nor capricious. We are not called upon to decide whether the provision was perfect; neither do we hold that a better one could not have been fashioned. We do not deal in absolutes or in alternatives; we merely hold the regulation before us does not transgress the pertinent legal limitation.''

The requirement that services be reduced proportionately, if feasible, does not change the scope of judicial review as discussed above. Moreover proportionate reductions were not shown to be feasible.

The first of the grounds used to hold the regulations invalid turns on section 14103.7 (added by ch. 1421, Stats. 1967, *supra*) which reads:

''The Administrator of the Health and Welfare Agency, when reducing services under this chapter and Chapter 8 of this part in order to maintain the program within the fiscal limits fixed by the Legislature, shall, to the extent feasible, make proportionate reductions in all services, rather than eliminating any service or services entirely.''

Since it is conceded that the Administrator did not make proportionate reductions in all services, the question presented is whether the above section indicates a legislative intent to restrict the Administrator and, if it does, to what extent the section restricts his discretion. The answer to the question turns on the meaning of the phrase ''to the extent feasible.''

The trial court, in its memorandum opinion, stated "[i]n this context 'feasible' would seem to mean 'capable of being done' and 'suitable.' (Random House Dictionary (1966) 520)." The Legislature used the phrase "to the extent feasible" to embody the concept of being practicable; workable; and viable rather than remotely possible.

The term "feasibility" has acquired a generally understood meaning in legislative and governmental administrative areas. It connotes a weighing of all relevant facts with a view towards determining whether a particular objective can be successfully accomplished by alternative methods. It implies rejection of methods which are unworkable, excessively costly, or which would not result in a viable program.

The question is whether the particular alternative method of cost reduction is reasonably likely to carry out the legislative intent and purpose. The Legislature used the phrase "to the extent feasible" to channel the Administrator's efforts but not to restrict his expertise and discretion and certainly not to eliminate them completely. Thus, the phrase was simply designed to indicate a preference for partial reductions in all services rather than the arbitrary elimination of many services. To read the phrase as putting a more onerous burden on the Administrator is an attempt to change the generally recognized standard or scope of review in cases such as this. The authorities cited above set forth the proper scope of review, and the test on review is not changed simply because the Legislature has used the phrase "to the extent feasible" rather than a phrase such as "to the extent he determines practicable after the exercise of his expertise and discretion."

The real vice inherent in this question of "feasibility" is the opportunity it presents for changing the scope of review by rephrasing the issue. Instead of determining whether the Administrator resolved an extremely difficult problem in a not unreasonable manner after exercising the discretion vested in him by law and the expertise that his staff acquired through years of experience, the trial court converted the issue from the review of a quasi-legislative action to an exercise in determining what words mean, thus allowing the court to second-guess the Administrator.

As previously discussed, the possibility of making proportionate cuts was considered by the Administrator, and such reductions were rejected only after careful deliberation. This exercise of discretion should not be rejected through an erroneous interpretation of the meaning of the term "feasible"

any more than it should be found to be arbitrary or capricious. It has already been demonstrated that the Administrator's action was not arbitrary or capricious.

Compounding the error in interpreting the term "feasible" was the court's error in placing on the Administrator the burden of proof as to the question of the feasibility of proportionate cuts. This second error facilitated the process whereby the court substituted its judgment for that of the Administrator.

In its memorandum opinion the court stated "an adequate basis has not been given to it [by the Administrator] for it [the court] to be able to hold that the proportionate reductions in services directed by the Legislature are not feasible." Counsel for defendants repeatedly asked the court to clearly indicate the burden of proof with respect to the question of demonstrating the nonfeasibility of proportionate reductions in services. The trial court opened the hearing with extensive references to *Pitts* v. *Perluss, supra,* 58 Cal.2d 824, and closed the hearing with references to the views of Justice Frankfurter, all to the effect that courts should not interfere with the discretion given to trained administrators and should not act as "a super-administrator in trying to determine the wisdom of a particular policy." The court continually indicated that it would not substitute its judgment of feasibility for that of the Administrator and gave continued assurance of its knowledge of these statutes (Evid. Code, § 644) that provide that regulations are presumed valid and that official conduct is presumed to have been properly performed. Yet in its memorandum opinion the court plainly treated the case as one in which the burden of proof was on the Administrator. When this was made evident at the hearing on the settlement of findings of fact and conclusions of law, the trial court recognized that it had misled the parties and candidly admitted its error in its findings.

After a careful review of the transcript of the September 6 hearing, the court stated "the court did not indicate that the Administrator had the burden of explanation and in fact indicated that the plaintiffs had such a burden." The court thereupon proposed and eventually signed the following finding of fact:

"The Administrator did not provide explanations convincing to the court of the lack of feasibility of proportionate reductions in service. *The court did indicate to the parties at*

*the hearing that the burden of proof in this regard rested on the plaintiffs.''* (Italics added.)

The effect of shifting the burden of proof to defendants permitted the court to substitute its judgment for that of the Administrator on the question of the feasibility of proportionate reductions in services. In doing this, the trial court abused its discretion and committed reversible error.

Irrespective of the error of improperly placing the burden of proof on defendants, plaintiffs did have the burden of proof and failed to meet or sustain that burden. The burden of proof was not on the Administrator to show the nonfeasibility of proportionate reductions. The burden was on the plaintiffs to show the feasibility of proportionate reductions. (This is so even though defendants may have had superior knowledge of the workings of the program.) By law this burden was assumed by plaintiffs and by law remained with them. Plaintiffs sought to evade and avoid this burden of proof by simply presenting the regulations and pointing out that certain services were eliminated rather than proportionately reduced.

Plaintiffs did not demonstrate that the Administrator's determination that it was not feasible to proportionately reduce services (and that the elimination of some services was then necessary) constituted an arbitrary and capricious abuse of the discretion vested in him by the Legislature.

The trial court recognized that plaintiffs had not met this burden of proof and plainly and pointedly refused to find that ''defendants' determination that proportionate reductions were not feasible was arbitrary, capricious and constituted an abuse of discretion.'' It rejected a proposed conclusion of law to that effect.

The next problem is whether the law requires the elimination of the medically needy from the program before any reductions are permitted in the minimum coverage provided to recipients of public assistance. The trial court held that the medically needy had to be eliminated before services were cut. It relied on section 14105, the last paragraph of which provides:

''Notwithstanding the provisions of the preceding paragraph, and in accordance with the intent of this chapter and Chapter 8 (commencing with Section 14500), the director, with respect to medically indigent persons, may limit, by appropriate classifications, the number of medically indigent persons eligible, and may limit the scope and kinds of basic health care and extended health services to which such per-

sons are entitled, to the extent necessary to operate programs under this part within the limits of appropriated funds. When and if necessary, such action shall be taken by the director with the advice of the Health Review and Program Council and in ways consistent with the requirements of the Federal Social Security Act.'' In other words, the section provides that if there are insufficient funds, certain groups of *people* may be removed from the program.

The 1967 statute (chapter 1421, *supra*) unquestionably provided insufficient funds to maintain the Medi-Cal Program at previous levels. Cuts in the program were obviously required. Chapter 1421 constituted a conscious legislative attempt to give direction to the Administrator on how to make the necessary program cuts. The important part of chapter 1421 is the Legislature's adoption of section 14103.7, which provides for reducing *services* (proportionately, if feasible), rather than persons.

Thus, the conflict. The earlier statute, section 14105, says eliminate *people*. The latter enactment, section 14103.7, says reduce or eliminate *services*. The Administrator had to resolve this conflict and develop regulations which would meet the fiscal problem. He did so by examining the expressions of legislative intent and he interpreted the more recent provisions of section 14103.7 as having been intended by the Legislature to modify the earlier provisions of section 14105. Accordingly, he reduced services rather than totally removing the medically indigent from the Medi-Cal Program. Logic, as well as consistency, supports the Administrator's interpretation and the applicability of section 14103.7.

Even if there is no conflict between sections 14105 and 14103.7, the problem of whether persons should be eliminated rests on an interpretation of the last paragraph of section 14105, which says the elimination of persons is discretionary rather than mandatory. That is, it provides that if fiscal limitations require, the director *may* limit the scope and kinds of health care services to be made available to the medically indigent. The paragraph does not *require* the director to take such action. Thus, the first sentence of the paragraph repeatedly uses the word ''may,'' indicating a legislative intent to confer discretion upon the director. Other more expressive words could have been found had the Legislature intended to direct that he remove the medically indigent, regardless of other considerations, at the first sign of fiscal difficulties. Moreover, in this connection the first sentence of the last para-

graph should be compared with the last sentence of the last paragraph. Thus, in the last sentence the word ''shall'' is used when the Legislature directs that the director must secure the advice of the Health Review and Program Council if he exercises the discretion granted to him by the first sentence of the paragraph. This usage of the terms ''may'' and ''shall'' within the same paragraph evidences a carefully expressed legislative intent to grant discretion to the Administrator insofar as the elimination of medically indigent persons is concerned, but to not give the Administrator any discretion insofar as securing the advice of the Council.

Finally, as previously noted, the record demonstrates that the Administrator did consider eliminating the medically needy and rejected that alternative only after a careful weighing of all the available facts and after a full consideration of the fiscal problem and its legislative history. The effects of eliminating the medically needy were set forth in great detail in the Medi-Cal Fiscal and Expenditure Program Summary which was attached to Exhibit A as a part of Mr. Stewart's affidavit. It was recognized that ''the elimination of that group (over 160,000 persons) would have resulted in an annual cost reduction to the Medi-Cal Program of about $145 million.''

Mr. Mulder in his testimony continued: ''[B]ut, at the same time, to the extent that this group of individuals would be in need of basic services such as hospitalization and physicians' services and x-ray and laboratory services and nursing home services, they would still have a continued need for these services; still they would have a continuing inability to completely pay for the services, and therefore would rely for the services upon county government, under the provisions of the indigent statutes, which, therefore, would have the effect of losing all federal money that is now being obtained by providing these services through the Medi-Cal program and placing the burden upon the local tax rates without relief from the Medi-Cal program, because the Legislature has closed the relief to counties for the hospital system at the amount of $44,000,000 for the current fiscal term.''

With the adoption of the Medi-Cal Program in 1966, the counties feared an enormous expansion of county costs. As a pre-condition to their providing legislative support to the enactment of this program, their representatives insisted on inclusion within the program of guarantees that would limit their health care costs. The administration and the Legisla-

ture agreed. That understanding was embodied in section 14150.1. In addition, the State agreed to provide $44 million in general fund revenues to assist the counties in providing health care to non-Medi-Cal beneficiaries. This latter provision, referred to by Mr. Mulder, is found in section 14150.2 (added by ch. 104, Stats. 1967).

The administrator, in his deliberations, was well aware that with the advent of both the Medi-Care and Medi-Cal Programs, counties had expanded their health care services, had instituted new, substantial and on-going programs involving large expenditures and had taken important steps to transform county hospitals into general hospitals. The Administrator knew of these factors and desired to forestall and prevent, if possible, any violation of what he deemed to be assurances that had been made to the counties of the legislative intent to stabilize county and state costs (as contained in §§ 14150.1 and 14150.2) and did not wish to reverse the trend towards the establishment of county hospitals as general hospitals as a part of the realization of the "mainstream concept" embodied in sections 14000, subdivision (b), and 14000.2.

The Administrator not only believed that the elimination of the medically needy would violate these principles but would also cause an increase in state costs in mental institutions, thus violating that portion of section 14150.2 which provides that "In no case shall the administrator approve any plan which increases costs to the state above the limit on expenditures specified in subdivision (c) of this section."

In addition, the Administrator of course recognized the cruel irony that would result in depriving the very group which has managed to maintain itself on meager resources without the aid of public assistance of the free choice of physicians offered in the mainstream of medical care while affording this wide range of services to recipients of public assistance.

The provisions of the Medi-Cal Program taken as a whole plainly require the Administrator to be concerned with the impact of health care costs upon the entire California population, not merely upon the Health Care Deposit Fund. After considering all of these factors he concluded that the loss of federal sharing funds plus the shift of fiscal liability to the counties' tax resources, together with a marked retreat from the mainstream medical care concept, would result in a situation not consistent with the overall legislative objectives and purposes. Accordingly, he concluded that in resolving the

contradictory guidelines contained in sections 14103.7 and 14105, namely, the conflict between eliminating services and eliminating persons, greater weight and attention should properly be placed on the more recent expression of legislative intent, not only because it was more recent but also because it was part of a legislative measure specifically tailored and designed to guide the Administrator in making reductions in the program.

Furthermore, even if there was no implied modification or repeal of section 14105, still that section confers discretion upon the Administrator, which he exercised in a sound and logical manner.

The Legislature did not direct that certain services, i.e., the "Basic Five" or "Minimum Coverage," be provided regardless of the fiscal situation. Services may be reduced before eliminating the medically indigent from the program, and the Administrator's decisions concerning the cuts and services were neither arbitrary nor capricious. The further issue of whether the terms "minimum coverage" or "basic five" services encompass the full gamut of all services that are available in physicians' offices, hospitals and nursing homes depends upon the interpretation of sections 14105, 14053 and 14056 plus chapter 1421, *supra*. The fourth paragraph of section 14105 provides that:

"In establishing the scope of services to be provided, the director shall provide for recipients [of public assistance] at least for a minimum coverage as defined in Section 14056, and insofar as possible shall include other health care and related remedial or preventive services giving priority to those services which are considered to have the greatest value in preventing or reducing the likelihood of future high cost medical services."

Section 14056 reads: " 'Minimum coverage' means care or coverage specified in paragraphs (1), (2), (3), (4), and (5) of Section 14053."

The minimum coverage referred to in section 14056 thus constitutes the first five items in section 14053, which reads:

" 'Health care and related remedial or preventive service' means:

"1. Inpatient hospital services (other than services in a medical institution for tuberculosis or mental diseases) in and by a medical institution or facility operated by, or licensed by, the United States, one of the several states, a political subdivision of a state, the State Department of Public Health,

or exempt from such licensure pursuant to subdivision (c) of Section 1415 of the Health and Safety Code.

"2. Outpatient hospital services.

"3. Laboratory and X-ray services.

"4. Skilled nursing home services (other than services in a medical institution for tuberculosis or mental diseases), as defined for the purpose of securing federal approval of a plan under Title XIX of the Federal Social Security Act, to persons 21 years of age or older.

"5. Physicians' services, whether furnished in the office, the patient's home, a hospital, or a skilled nursing home, or elsewhere.

"6. Medical care, or any other type of remedial care recognized under the laws of this state, furnished by licensed practitioners within the scope of their practice as defined by the laws of this state. Other remedial care shall include, without being limited to, treatment by prayer or healing by spiritual means in the practice of any church or religious denomination insofar as these can be encompassed by federal participation under an approved plan.

"7. Home health care services.

"8. Private duty nursing services.

"9. Outpatient clinic services.

"10. Dental services.

"11. Physical therapy and related services.

"12. Prescribed drugs, dentures, and prosthetic devices; and eye glasses prescribed by a physician skilled in the diseases of the eye or by an optometrist, whichever the individual may select.

"13. Other diagnostic, screening, preventive, or rehabilitative services.

"14. Inpatient hospital services and skilled nursing home services for individuals 65 years of age or over in an institution for tuberculosis or mental diseases except that basic health care shall not include any of the care and services specified in paragraphs 1 through 14 for any person who is an inmate of a public custodial or correctional institution or any person who has not attained 65 years of age and is a patient in a medical institution for tuberculosis or mental diseases.

"15. Except that such term shall not include

"a. Any care or services for any individual who is an inmate of a public institution (except as a patient in a medical institution) ; or

"b. Any care or services for any individual who has not

attained 65 years of age and who is a patient in an institution for tuberculosis or mental diseases.''

Section 14053 is a part of a group of statutory definitions. It sets forth a listing of a practically unlimited range of health care services that might conceivably be provided if facilities and funds were unlimited. This listing of categories of health care and related services lacks any clear cut definition of the various categories of service. It simply consists of a grouping of very broad categories of medical care. Although unquestionably some services in each of the first five categories should be available, neither section 14053 nor any other statute prescribes the specific quantities or types of such services that are required. Certainly the scope of services within the categories constituting the minimum coverage to public assistance recipients can be and has in fact been expanded when funds were available. Conversely, when funds are in short supply the scope of services should be able to contract. Neither the expansion nor the contraction requires any change in the statutory language.

Although the Basic Five services are recognized as constituting the foundation of a sound medical program, the Administrator has long recognized that such services have never been unrestricted and that the minimum adequate standard of care (which is essentially what the Basic Five services are designed to provide) must be interpreted with reference to available funds. Recognizing that all previous services could not be financed in toto with available funds, the Administrator determined that it was necessary to further restrict some of the services falling within the first five categories that had previously been provided to recipients of public assistance, such as, the providing of in-patient psychiatric care and eye refractions except following eye surgery.

The emergency regulations represent additional limitations on what is covered within certain of the Basic Five services but they do not constitute a denial or illegal reduction of the Basic Five services.

It would seem that if the Administrator's original regulations concerning what is covered by the Basic Five could not be changed regardless of the fiscal situation, then in effect the Legislature has created a conflict by virtue of appropriating insufficient money to pay for the Basic Five services. The Legislature intended to allow such reasonable definitional adjustments in the Basic Five as were necessary to meet the fiscal problem and did not intend to forever freeze into the

law either the definitions of the Basic Five services which were adopted by the Administrator immediately subsequent to the adoption of the law setting forth the Basic Five services nor the definitions of the Basic Five services which were in effect on August 31, 1967, immediately prior to the adoption of the regulations in question.

However, the trial court held that the law (and particularly sections 14105, 14056 and 14053) does not permit any reduction in the so-called "minimum coverage" provided to recipients of public assistance. The problem with this position is that it rests on the unarticulated assumption that the term "minimum coverage" constitutes a sort of inviolate package from which nothing can be removed without violating the law and on the assumption that there is a fixed and immutable definition of each of the services included in the term. No such definition has been found.

It could be contended that when the Legislature adopted section 14053 it also adopted the subsequent administrative rulings which set forth the specific services that would be provided as a part of the "minimum coverage" and that any subsequent change or diminution in coverage would somehow violate the definitions so incorporated. This, however, is plainly contrary to the general tenor and purpose not only of the 1967 amendments to the law but to the entire health care law. It is apparent that several of the Basic Five services and especially physicians' services could be defined in any number of ways. No one apparently has ever contended that physicians' services must necessarily, and by legislative mandate, be considered to include every possible service which can be rendered by a physician at any time or place. For example, if, on August 31, 1967, cosmetic surgery was previously authorized under the regulations, would this mean that thereafter the Administrator could not, without violating the law, deny cosmetic surgery to recipients of public assistance regardless of the availability of funds? Certainly cosmetic surgery would involve either "inpatient hospital services" or "outpatient hospital services" and "physicians' services," all of which are included in the Basic Five. Yet cosmetic surgery has never been provided to Medi-Cal beneficiaries. (See 22 Cal.Admin. Code, § 41305(a)(2) as it read prior to its amendment effective September 1, 1967.)

Lacking a clear statement of the scope of the term "minimum coverage," a holding that the regulations illegally reduced minimum coverage is obviously lacking in logic.

In *Ehrenreich* v. *Shelton*, 213 Cal.App.2d 376, 379 [28 Cal.Rptr. 855], the court said: ''In a number of cases, however, it has been held that where the record reflects that in arriving at the result of which appellant complains, the trial court relied upon erroneous reasoning and except for that reliance would probably not have reached such result, then a judgment may properly be reversed.''

In the absence of a clear legislative definition, which does not exist, or a commonly accepted professional definition, the Administrator was by necessary implication given the authority to adopt definitions in light of the program objectives, medical practice, the utilization of mainstream medical care generally, and the legislatively imposed fiscal limitations. The Administrator did, by his regulations, determine what services could be allowed as the Basic Five. The discussion above shows that his definitions and limitations were reasonable; certainly they were not arbitrary or capricious or entirely lacking in evidentiary support. Therefore, the restrictions on the Basic Five should be upheld.

The scope of judicial review is whether the quasi-legislative action of the Administrator has been proved to be arbitrary or capricious. This has not been done in the instant case. On the contrary, the record demonstrates that the emergency regulations were reasonable, valid and proper. Mr. Spencer Williams, Administrator of the Health and Welfare Agency, has exercised in a careful and excellent manner the powers conferred upon him by the legislative branch of the government.

I would reverse the judgment of the superior court and direct it to hold defendants' regulations valid.

BURKE, J.—I dissent. In 1967 the Legislature, with full knowledge that the funds appropriated for Medi-Cal were insufficient to continue all the services to all the beneficiaries to which the program had been extended, adopted certain all-important amendments. In the last of these amendments adopted by chapter 1421 of the Statutes of 1967 (regular session) the Legislature added a new section (§ 14103.7)[1] directing that the Administrator, when reducing services in order to maintain the program within the fiscal limits, shall ''to the extent feasible, make proportionate reductions in all services, rather than eliminating any service or services entirely.''

---

[1] All section references are to the Welfare and Institutions Code.

The trial court and the majority of this court construe this section in context with the entire maze of statutory provisions to which it was added and arrive at one conclusion. The Administrator, however, viewed the new section 14103.7, as controlling, and to the extent that it presented any conflict with any of the other relevant sections (14105, 14056, 14053 and 14006.5) as superseding those earlier enactments.

The proper test as to which interpretation is correct depends upon the construction to be accorded the phrase in section 14103.7, "to the extent feasible." Does this vest certain discretion in the Administrator? Is it *his* determination as to what is feasible which controls, or are his functions merely ministerial?

In administering a program as new, perplexing and complex as this one, I believe the Legislature intended to vest broad powers in the Administrator and that this crucial phrase should be interpreted as vesting him with discretion; furthermore, that his determinations as to what is feasible should be sustained unless shown to be "arbitrary, capricious, or entirely lacking in evidentiary support. . . ." (*Brock* v. *Superior Court,* 109 Cal.App.2d 594, 605 [8] [241 P.2d 283].)

The construction of a statute by an agency charged with its administration is entitled to great weight and, although final responsibility for its interpretation rests with the courts, in making such determination the court may not "superimpose its own policy judgment upon the agency in the absence of an arbitrary and capricious decision." (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 832 [27 Cal.Rptr. 19, 377 P.2d 83].)

Here the trial court found that the showing of the Administrator with respect to feasibility was not "convincing to the court," and consequently the amended regulations adopted by him were invalid in that respect. This, I submit, was an erroneous application of the power of review of the acts of the Administrator. The test is not whether the showing as to feasibility is "convincing to the court," but whether the feasibility decisions of the Administrator:

1. Were arbitrary? Clearly, they were not.

2. Were capricious? No one so contends. On the contrary, the decisions made were painstakingly analyzed by both the experts on the staff and by the Administrator himself.

3. Were *entirely* lacking in evidentiary support? Although in the light of the evidence submitted reasonable minds could and obviously did differ on whether certain actions were feasible, it cannot be said upon a review of the record that the

actions taken by the Administrator were *entirely* lacking in evidentiary support.

Under these circumstances the trial court erred in holding the amended regulations invalid.

The trial court also concluded that the amended regulations by eliminating as physicians' services certain psychiatric service and eye refractions do not provide for the minimum coverage for public assistance recipients as required by sections 14105, 14056 and 14053, and to that extent they are invalid. It further concluded that since the amended regulations, in effect, do not eliminate the medically indigent from the program to the extent necessary to continue minimum services to the welfare recipients the regulations were also invalid in that respect.

But these conclusions are dependent upon the effect and weight to be given to the new section added by the Legislature as its last pronouncement and referred to above, section 14103.7. Although the various sections are certainly not a model of clarity, the construction placed upon section 14103.7 by the Administrator in relation to the other sections mentioned above is not unreasonable. Had the Legislature intended to prohibit *any service* to be rendered to those in the medically indigent classes mentioned in section 14006.5, subdivisions (b), (c) and (d), it could have so stated. But it did not. What it did say, in section 14103.7, was directly to the contrary. It mandated the Administrator when reducing services "under this chapter and Chapter 8" (which includes *all* classes, the welfare recipients *and* the medically indigent) to make proportionate reductions "*in all services,* rather than eliminating *any* service or services entirely." (Italics added.) Strictly construed, this language clearly admonishes the Administrator to *continue* services to the extent feasible to *all* beneficiaries of the program, including *all* categories ( (a), (b), (c) and (d) ). Thus, the section does not mandate him to eliminate rendering services to specific classes but to make reductions in .*all* services (proportionately to the extent feasible).

In fact, neither does section 14006.5, the so-called priorities section, which the majority deem controlling, mandate the Administrator to eliminate *all* services to the three classes of medically indigent, should the funds prove insufficient to continue minimum standards of medical aid to public assistance recipients. The admonition in the latter section is not to eliminate *categories* of *persons* from *all* services but to reduce

*services* in accordance with the priorities. Had the Legislature intended to eliminate entire categories of persons from participation rather than reduce *services,* it would have been simple to have so stated.

Section 14103.7 directed the Administrator, in curtailing services, to do so by proportionate reduction in all services rather than by eliminating any service or services entirely. But it expressly qualified this admonition by the phrase "to the extent feasible." In the exercise of his discretion the Administrator found that certain services did not lend themselves to proportionate reductions, such as certain outpatient psychiatric services and eye refractions, and others mentioned in the majority opinion. These determinations appear to be entirely sensible and reasonable and certainly do not fall within the category of being arbitrary or capricious. They therefore should be sustained by the courts. If these regulations do not comport with what the Legislature intended then the remedy may be supplied by appropriate legislative amendment.