Filed 8/29/22 Courson v. County of Los Angeles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| WILLIAM COURSON, | B309524 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BS174210) |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

———————————

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge. Affirmed.

Rains Lucia Stern St. Phalle & Silver, Elizabeth Silver Tourgeman, Michael A. Morguess and Gidian R. Mellk for Plaintiff and Appellant.

Peterson · Bradford · Burkwitz, Avi Burkwitz, Sherry M. Gregorio and Gil Burkwitz for Defendants and Respondents.

———————————

## INTRODUCTION

The Los Angeles County Sheriff's Department (Department) suspended appellant William Courson for 30 days without pay based on statements Courson made to undercover FBI agent Leah Marx, some of which were captured on recordings Marx surreptitiously made.

The statements came to light during a federal criminal trial of other Department staff and received media attention. The Department thereafter conducted an investigation and concluded that Courson had "misrepresented and/or exaggerated the use of force in the jails" in his statements to Marx which had brought "discredit and undue embarrassment to [himself] and the Department."

Courson challenged the discipline and the Civil Service Commission of the County of Los Angeles (Commission) appointed a hearing officer, who held a two-day hearing and issued proposed findings and conclusions, and a recommendation. The Commission ultimately upheld the discipline. Courson filed a petition for administrative mandate seeking to have the Commission's decision set aside. In the petition, Courson also sought extraordinary relief pursuant to Government Code section 3309.5, arguing that he had not received timely notice of the Department's intent to discipline him, because, even though he was notified within a year of the revelations in the federal criminal trial and the associated publicity, his underlying conduct—the statements to Marx—had occurred nearly five years earlier. The County of Los Angeles (County) opposed the petition. The trial court denied the petition for a writ of administrative mandate and also denied extraordinary relief under Government Code section 3309.5.

2

Courson appeals, contending that the notice of proposed discipline was untimely, and that the Commission abused its discretion by upholding such a severe disciplinary sanction. We conclude that the Department timely notified Courson of the proposed discipline and the Commission did not abuse its discretion in upholding the 30-day suspension, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Courson's Interactions with FBI Agent Marx

Courson was hired by the Department in September 2007. In August 2010, while assigned as a custody deputy sheriff at Men's Central Jail (MCJ), Courson met Marx, who began visiting MCJ under the guise that she was interviewing inmates as part of an investigation into human trafficking. In fact, Marx was conducting an undercover investigation into allegations of excessive use of force at MCJ.

Courson found Marx attractive and "wanted to sleep with her." Courson chatted with Marx at MCJ and the two began communicating by e-mail and met on a couple of occasions outside of MCJ for meals. They discussed Courson's job and incidents occurring at MCJ. Marx told Courson that she was doing a research paper on different agencies' use of force policies as a school project and Courson provided Marx with a copy of the Department's defensive tactics manual and information about some use of force incidents at MCJ.

According to testimony Marx later gave in a federal criminal trial arising from the FBI's investigation of the Department, Courson told her that he had either used a flashlight to hit an inmate unnecessarily or had wanted to do so. Marx further testified that she had reported Courson's

3

statements to her supervisor, which prompted Marx to begin secretly recording her conversations with Courson. Marx recorded her conversations with Courson on at least two occasions when the two met for meals outside of MCJ.

**B.** **The Department First Learns of an FBI Investigation and Interviews Courson**

In August of 2011, the Department discovered the FBI was conducting a covert investigation of the Department regarding its operation of MCJ, and had smuggled a cell phone to an inmate at MCJ. On August 30, 2011, Department managers held meetings with MCJ staff to ascertain if anyone had been contacted by any member of the FBI. Courson came forward and told his unit captain, Captain Ornelas, that he had been communicating with Marx. At the administrative hearing, Courson testified he told Captain Ornelas he had started talking with Marx because he "just wanted to get in her britches," and he disclosed to Captain Ornelas the conversations that he had with Marx "[a]s much as I remembered."

Immediately after his meeting with Captain Ornelas, Courson was interviewed by three investigators from the Department's Internal Criminal Investigation Bureau (ICIB)— Sergeant Scott Craig, Sergeant Maricela Long, and Lieutenant Steven Leavins. A recording of this interview was made.

Sergeant Craig began the recording of the interview by telling Courson "as far as we know, you've done nothing wrong and we don't want to talk to you about anything you might have done wrong. We're not investigating you for anything, okay?" He then told Courson "[y]ou just been identified to us as a person who may or may not have information relating to something we're investigating." Courson told the investigators he had met

Marx when she came into the clinic where he worked at MCJ, he had pursued a social relationship with her because he found her attractive, and he and Marx had exchanged e-mails and met outside of work possibly four times. Courson said that Marx would ask him what was new and exciting at work and he told her about incidents at MCJ, including one where an inmate was strangled by his cellmates. He said he had provided Marx with the name and booking number of inmates involved in incidents he described, which Marx had requested because she was ostensibly interviewing inmates for a human trafficking investigation and wanted to know if the inmates had been involved in any incident.

When asked what other information he had provided to Marx, Courson indicated he had given her a copy of a defensive tactics manual he had obtained from the Department's Intranet, because she had told him she was working on a school paper. The investigators asked whether Marx had ever inquired about specific deputies, and Courson responded that she had asked about one.

The investigators asked Courson whether he "ever witnessed any . . . incidents or behavior by deputy sheriffs or any other personnel within the confines of Men's Central Jail that could be construed as or looked upon as civil rights violations? [¶] . . . [¶] Brutality? Anything illegal that you witnessed?" Courson answered "No" and stated that he would report such incidents. Courson informed the investigators that he had told them everything he remembered about his communications with Marx. They asked whether Courson had ever passed notes or a cell phone from the FBI to an inmate, or had taken a photograph of an inmate for the FBI, and he answered, "No."

5

Towards the end of the interview, Sergeant Craig asked Courson, "Any burning things that you're thinking of that we haven't asked you that you think we should know or that we should ask?" and Courson responded, "No, sir, I've been trying to think of more that I have forgotten, but I can't think of anything." At the end of the interview, the ICIB investigators instructed Courson to notify them immediately if he was contacted by the FBI or Marx again, or if someone started threatening him "with a subpoena or any other nonsense." Investigator Craig clarified, "I'm not talking about a federal grand jury subpoenaing you, okay?"

## C. Courson Testifies Before the Grand Jury and at the Criminal Trial

At the time of his interviews with Captain Ornelas and the ICIB investigators, Courson was not aware that Marx had recorded some of his statements. Courson became aware of the recordings in about July of 2013, when he testified before a federal grand jury.

On June 4, 2014, Courson testified in a federal criminal case against the three ICIB investigators who had interviewed him—Sergeant Craig, Sergeant Long, Lieutenant Leavins—and three other Department members. In the federal case, the Department officers were accused of interfering in a federal investigation. Courson testified about his personal conversations with Marx from August 2010, as well as some specific incidents that had occurred at MCJ.

He also testified that during a "Jail Ops" training he received at the Department in 2008, he was taught an "unwritten rule" that if an inmate fought with a deputy the inmate would go to the hospital. Courson testified that he discussed this

unwritten rule with Marx.  When asked by one of the criminal defense attorneys, "Would you say that some of the things that you were telling Leah Marx—would you say that maybe you were pumping up or inflating a little bit of what some of these—some of the things that you saw to kind of—to make yourself out as the good guy?"  Courson answered, "Exaggeration?  Yes sir."

Marx also testified at the trial, including about her conversations with Courson.  The record contains only one page of her actual testimony; in that testimony, she stated in reference to Courson, "[o]n one occasion, he made a statement about using a flashlight when he wanted to versus rather he didn't need to, but he wanted to in regards to hitting an inmate with it."

## D.    Media Coverage of the Trial and Courson's Testimony

A Los Angeles Times reporter wrote a detailed story about Courson's June 4, 2014, testimony during the federal trial and published it that same date.  The article summarized some of Courson's testimony, including that he had learned the "unwritten rule" during a training session.  It also indicated Marx had testified that Courson told her he sometimes used his flashlight to subdue inmates because he wanted to, not out of need.[1]  The article included a link to one of the recordings made by Marx, which included the following statements:

Courson:  "They just zipped him up in a body bag and wheeled him out the back door . . . eh, whatever . . . more room for somebody else. . . .  I'm looking at it, if they want to kill each other off, why do I care?"

---

[1] It is unclear whether this refers to the portion of Marx's testimony included in the record and quoted above.

Courson: "[T]hey're gonna get beat down by their own people, more than likely worse than what we would normally do to them, which is bad, because we send them to the hospital."

Marx: "Like, why though?"

Courson: "Why what?"

Marx: "Why would you get sent to the hospital?"

Courson: "Because every time they fight with us, it's like an unwritten rule they go to the hospital."

Courson: "We have a sergeant come for Jail Ops."

Marx: "At the academy?"

Courson: "Mmm hmm."

Marx: "Oh, and they kind of say like . . ."

Courson: "Well, after we graduate from the academy, you go through I think it's a week or two-week course of Jail Ops."

Marx: "Oh, that's right I remember you telling me that."

Courson: "During that time, that's when they tell you it's an unwritten rule that any inmate that fights with deputies goes to the hospital."

Marx: "Got it. Even if it's not necessary, you do it — to teach them a lesson, or what?"

Courson: "Pretty much."

Two weeks later, on July 18, 2014, a National Public Radio podcast discussed Courson's testimony at the federal criminal trial and played some of the recordings Marx had made.

## E. The Department Investigates Courson's Misconduct that was Revealed in the Criminal Trial

The Department initiated an Internal Affairs Bureau (IAB) investigation into Courson's conduct on December 2, 2014. Courson was interviewed by IAB investigators on January 19, 2015, and again on March 31, 2015. On June 1, 2015, the

Department served Courson with written notice that it was suspending him without pay for 30 days for violating the Department's Manual of Policy and Procedures (MPP) sections 3-01/030.05 (General Behavior)[2] and 3-01/000.10 (Professional Conduct)[3]. As the basis for the alleged violations, the notice asserted that Courson "brought discredit and undue embarrassment to [himself] and the Department when, during off-duty conversations with FBI [a]gent Leah Marx beginning in or around August 2010, you misrepresented and/or exaggerated the use of force in the jails" by (a) "telling [a]gent Marx that there was an 'unwritten rule' in the jail that if an inmate fights with a deputy, the deputy is to use enough force to send the inmate to the hospital," (b) telling Marx that a deputy can use force on an inmate if the deputy perceives the inmate wants to fight,
(c) telling Marx "about using a flashlight to hit an inmate because you wanted to, rather than actually needing to,"
(d) "exaggerat[ing] the amount of force and/or violence occurring in the jail," misrepresenting to Marx that he had firsthand knowledge of uses of force, and suggesting to Marx that jail fights were occurring every couple minutes, and (e) "telling [a]gent

---

[2] Section 3-01/030.05 of the MPP provides, in relevant part: "All Department members shall be held accountable for their actions, conduct, and speech when these behaviors conflict with Our <u>Core Values</u>, <u>Mission</u>, or <u>Creed</u>. Personnel who cause undue embarrassment or damage the reputation of and/or erode the public's confidence in the Department shall be deemed to have violated this policy."

[3] Section 3-01/000.10 of the MPP provides, in relevant part: "A member shall not act or behave while on or off duty in such a manner as to bring discredit upon himself or the Department."

Marx that you do not care if an inmate kills another inmate." The letter also asserted that "[y]our aforementioned misrepresentations and/or exaggerations regarding the use of force in jails led to national media attention of the Department, and caused you to testify in a federal trial regarding your exaggerated statements and/or misrepresentations."

## F.    The Administrative Hearing

Courson appealed the suspension to the Commission and Richard Terzian was appointed as a hearing officer to make findings of fact, conclusions of law, and a recommendation. A hearing was held on September 28 and 29, 2016. During the hearing, Courson testified he heard about the unwritten rule during the training session "like during a break. People were just standing around talking." When asked whether the sergeant who was doing the training mentioned the rule, he responded "I do not recall. I could not swear to or say he was not present during that moment." He did not recall who mentioned the rule.[4] Courson testified he told Marx he was trained that if he "perceived a threat" from an inmate he was free to "engage" with the inmate. Courson did not recall any conversation with Marx about him using a flashlight on an inmate. He testified concerning his descriptions of incidents at the jail, "I exaggerated the amount I knew or had firsthand knowledge of rather than just all hearsay, hearing stories from other people and I guess passing them off as I knew about them or I seen them." He did

---

[4] Courson testified that he understood the unwritten rule to mean that, if an inmate fought with a deputy, the deputy would use enough force to inflict injuries needing medical treatment at the hospital.

this because he wanted to impress Marx. When asked whether he had told Marx he did not care if an inmate kills another inmate, Courson responded "[i]t's very possible." He also testified, "[t]he only way I've ever said I don't care if anyone kills anyone is in relation to gang members. I don't care if gang members kill each other."

The hearing officer issued a report titled "Proposed Findings of Fact, Conclusions of Law and Recommendation" on December 2, 2016. His proposed findings included the following:

Fact No. 5: "[Courson] told [a]gent Marx that there was an unwritten rule of the Department that if an inmate attacked a deputy, that inmate would be beaten so severely so as to require hospitalization without making it clear that he had never been taught such a rule by the Department and was basing it on what other deputies had told him in casual conversations."

Fact No. 6: "[Courson] told [a]gent Marx that it would be sufficient justification to exercise force on an inmate based on a perception that the inmate is ready to attack, without explaining the use of force gradations he had been taught which would justify use of such force and which are shown in [e]xhibit 30."

Fact No. 7: "[Courson] told [a]gent Marx that he wanted to use his flashlight to strike an inmate when in fact he had only used a flashlight once under circumstances justifying such use of force."

Fact No. 8: "[Courson] exaggerated the amount of violence in the jail without having firsthand knowledge of same and having witnessed use of force by a deputy against an inmate only once under apparent circumstances of limited violence."

11

Fact No. 9: "[Courson] told [a]gent Marx that he did not care if an inmate killed another inmate without making it clear that he was only expressing a view about gang members."

The hearing officer concluded that, based on the foregoing findings, Courson had "brought discredit to himself and the Department by exaggerating and misrepresenting the use of force in the jails in violation of [s]ection 3-01/030.05 of Department Manual of Policy and Procedures," and had "brought undue embarrassment, damaged the reputation and eroded public confidence in the Department in violation of [s]ection 3-01/000.10 of Department Manual of Policy and Procedures." (Underscoring omitted.) However, the hearing officer concluded that the 30-day suspension was excessive and recommended that the suspension be reduced to 15 days.

The Commission remanded the matter back to the hearing officer for additional analysis regarding his recommendation to reduce the length of the suspension. On January 31, 2017, the hearing officer issued an amended report, titled "Proposed Findings of Fact, Conclusions of Law and Recommendation (Remand)." In this amended report, the hearing officer made the same factual findings and reached the same legal conclusions as in his initial report. However, he added an explanation that he recommended decreasing the suspension to 15 days for the following reasons: (1) Courson did not make any public statements other than his trial testimony; (2) most of Courson's contact with Marx was during private communications, and the Department did not contend that it was improper for Courson to have a social relationship with Marx; (3) Courson's communications to Marx did not cause the FBI to commence its investigation of the Department, and the issue of unlawful

12

violence by jail deputies had been public before Courson's trial testimony; (4) the Department's decision-maker, Chief Eric Parra, incorrectly "believed that [Courson's] initial comments to [a]gent Marx in the jail caused the FBI to 'open a case on the Sheriff's Department' based on those statements"; (5) Courson had worked for the Department for eight years without any other discipline; (6) Courson immediately informed his supervisors when the Department asked if anyone had been contacted by the FBI and was "forthright throughout the subsequent Internal Affairs interviews;" (7) Chief Parra evidently relied heavily on the public perception of Courson's statements, but Courson's only public statements came during his trial testimony, and there was much other adverse publicity about the conditions at the jail; and (8) the 30-day suspension seemed excessive when compared to the maximum penalties for other types of offenses, such as " 'inappropriate display of a weapon' " or " 'deceitful business transactions.' "

On April 4, 2017, the Commission served notice of its proposed decision to accept the hearing officer's findings and recommendation to reduce the suspension to 15 days. The Department objected to the reduction of the suspension. On October 17, 2017, the Commission announced a new proposed decision to uphold the Department's request for a 30-day suspension. Courson filed an objection to the Commission's new proposed decision. On May 2, 2018, the Commission issued its final decision imposing a 30-day suspension.

## G.    Proceedings in the Superior Court

On July 13, 2018, Courson filed a verified petition for writ of mandate and for extraordinary relief. In the first cause of action, brought under Code of Civil Procedure section 1094.5,

13

Courson sought review of the Commission's final administrative decision, arguing that the decision was not supported by the findings, that the findings were not supported by the weight of the evidence, that he was denied fair hearing, and that the discipline imposed was an abuse of discretion. In the second cause of action, Courson sought extraordinary relief under Government Code section 3309.5, which is part of the Public Safety Officers Procedural Bill of Rights Act (POBRA; Gov. Code, § 3300 et seq.), and a peremptory writ of mandate under Code of Civil Procedure section 1085, based on his claim he was not provided a fair hearing on his challenge to the discipline imposed against him. In the third cause of action, Courson sought extraordinary relief under Government Code section 3309.5 and a peremptory writ of mandate under Code of Civil Procedure section 1085, based on his claim he did not receive notice of the proposed discipline within the one-year limitations period set forth in Government Code section 3304, subdivision (d)(1).

On October 7, 2020, the superior court denied Courson's petition. The court first addressed Courson's contention that the Department's notice of its proposed disciplinary action was not timely under Government Code section 3304, subdivision (d)(1). Quoting from *Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 104 (*Pedro*), the court indicated "[t]he one-year limitations period 'begins to run when a person authorized to initiate an investigation discovers, or through the use of reasonable diligence should have discovered, the allegation of misconduct."

The court then found that the Department did not discover, with reasonable diligence, the statements made by Courson to Marx which became the grounds for the suspension until those statements were disclosed on June 4, 2014, at the federal

14

criminal trial and in the related media reports. The court next addressed the five findings made by the hearing officer and adopted by the Commission in support of the suspension, and concluded they were supported by the weight of the evidence. The court then concluded that those five findings supported the conclusions that Courson had violated the two Department policies.

The court next rejected Courson's defense that he had been disciplined in retaliation for testifying at the federal trial, finding that Courson had failed to support this defense with sufficient argument or evidence. Finally, the court concluded that the Commission did not abuse its discretion in imposing a 30-day suspension.

On November 4, 2020, the superior court entered judgment and served notice of entry of judgment. Courson filed his notice of appeal on December 15, 2020.

## DISCUSSION

Courson appeals the trial court's denial of his petition for extraordinary relief under Government Code section 3309.5. That section allows a peace officer to seek relief for an alleged violation of POBRA. He argues that the Department is barred from imposing the discipline because it did not notify him of the charges within the applicable one-year limitations period set forth in POBRA, and specifically in Government Code section 3304, subdivision (d)(1). This is not a challenge to the Commission's findings, as Courson did not raise the limitations period in the administrative hearing process; Courson instead raised this issue for the first time in his petition for extraordinary

15

relief under Government Code section 3309.5.[5] Courson also appeals the trial court's denial of his petition for administrative mandate, arguing that the Commission abused its discretion in imposing a 30-day suspension because that level of discipline was too harsh.[6]

## A.    Statute of Limitations

Courson's argument that the Department did not timely notify him of the proposed discipline is based on the one-year limitations period set forth in Government Code section 3304, subdivision (d)(1). That section provides in relevant part: "Except as provided in this subdivision and subdivision (g), no punitive action, nor denial of promotion on grounds other than merit, shall be undertaken for any act, omission, or other allegation of misconduct if the investigation of the allegation is not completed within one year of the public agency's discovery by a person authorized to initiate an investigation of the allegation

---

[5] In *Gales v. Superior Court* (1996) 47 Cal.App.4th 1596, 1603, 1604, the court held that a peace officer can seek to enforce the limitations period set forth in Government Code section 3304, subdivision (d)(1) through a petition under Government Code section 3309.5, while concurrently challenging the disciplinary action at issue through a petition for writ of mandate under Code of Civil Procedure section 1094.5. (See *Alameida v. State Personnel Bd.* (2004) 120 Cal.App.4th 46, 54 [noting a peace officer can raise the statute of limitations set forth by Gov. Code, § 3304, subd. (d)(1) in either the administrative proceeding or a petition under Gov. Code, § 3309.5].)

[6] In this appeal, Courson does not challenge the findings made by the Commission, or its legal conclusion that he had violated Department policies.

of an act, omission, or other misconduct. This one-year limitation period shall apply only if the act, omission, or other misconduct occurred on or after January 1, 1998."

"The statute contemplates an investigation taking place for up to one year after the discovery of the alleged misconduct before an officer is notified that discipline may be imposed." (*Pedro*, *supra*, 229 Cal.App.4th at p. 103.) In *Pedro*, the court held that the term " 'discovery,' " as used in Government Code section 3304, subdivision (d)(1), should be interpreted to incorporate the common-law "discovery rule." (*Pedro*, *supra*, at pp. 105-106.) The court reasoned that the California courts have consistently interpreted the term "discovery" in the context of limitations periods to incorporate the discovery rule, and the Legislature is presumed to have known about the courts' interpretation. (*Ibid*.)

As the *Pedro* court explained, "[t]he discovery rule charges a plaintiff with presumptive knowledge of information that would have been revealed if he or she had conducted a reasonable investigation after becoming aware of or suspecting an injury caused by wrongdoing." (*Pedro*, *supra*, 229 Cal.App.4th at p. 104.) " 'In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation.' (*Fox* [*v. Ethicon Endo-Surgery, Inc.* (2005)] 35 Cal.4th [797,] 807-808 . . . .)" (*Ibid*.)

The *Pedro* court articulated the application of the discovery rule in this context as follows: "We therefore hold that the one-year limitations period under Government Code section 3304, subdivision (d)(1) begins to run when a person authorized to initiate an investigation discovers, or through the use of

17

reasonable diligence should have discovered, the allegation of misconduct." (*Pedro, supra,* 229 Cal.App.4th at p. 106.) "The date that a person in the exercise of reasonable diligence should have discovered the facts is a question of fact." (*Ibid.*; *Haney v. City of Los Angeles* (2003) 109 Cal.App.4th 1, 8.) An appellate court applies the substantial evidence test in reviewing such factual findings made by a trial court in adjudicating a petition under Government Code section 3309.5.[7] (*Shafer v. Los Angeles County Sheriff's Dept.* (2003) 106 Cal.App.4th 1388, 1396.)

There is no dispute that the Department first discovered on June 4, 2014, when Marx and Courson testified at the federal criminal trial and there was a news report about their testimony, that Courson had engaged in the behavior which ultimately became the basis for the 30-day suspension. Specifically, Marx's and Courson's testimony disclosed for the first time the facts that led the Department later to find that Courson had exaggerated and misrepresented the use of force in the jails, including by discussing the "unwritten rule" with Marx, exaggerating his knowledge of uses of force in his discussions with Marx, and telling Marx he had used a flashlight to strike an inmate without need or had wanted to do so. The recordings made by Marx,

---

[7] Citing *California Teachers Association v. San Diego Community College District* (1981) 28 Cal.3d 692, 699, Courson argues that "as here, when the facts do not conflict . . . , a reviewing court is not bound by the trial court's determination." *California Teachers Association* does not apply here, however, as it involved an issue of statutory interpretation, not a factual determination. (*Ibid.*) In any event, the date that the Department should have discovered the allegation of misconduct by Courson is a disputed factual issue.

which were made public on the same day, also disclosed that Courson had suggested to Marx that he had been taught the unwritten rule by the Department's training staff, had told Marx he did not care if an inmate killed another inmate, and had said to her that it would be sufficient justification for a jail deputy to use force on an inmate based on the deputy's perception that the inmate was ready to attack.

The Department provided Courson with notice of the proposed discipline on June 1, 2015, less than a year after Courson and Marx testified at the federal criminal trial.

Courson contends that under the discovery rule, the limitations period of Government Code section 3304, subdivision (d)(1) commenced on August 30, 2011, when Courson disclosed to the Department that he had been communicating with Marx. Under *Pedro*, the limitations period "begins to run when a person authorized to initiate an investigation discovers, or through the use of reasonable diligence should have discovered, the allegation of misconduct." (*Pedro, supra,* 229 Cal.App.4th at p. 106.)

The trial court found that the "Department did not discover, with the exercise of reasonable diligence, the allegation of misconduct against [Courson] prior to his testimony on June 4, 2014 at the federal trial." This finding is supported by substantial evidence.[8] Even though Captain Ornelas and the

_____

[8] Courson argues that this court may review the issue de novo because the trial court's determination "was based on the undisputed facts in the ICIB transcript and circumstances surrounding the genesis of the interview." The substantial evidence test applies regardless of whether the trial court made findings based on oral or documentary evidence. (*Desert Outdoor*

ICIB investigators learned on August 30, 2011, that Courson had communicated with Marx, they were not aware what Courson had told Marx about the "unwritten rule," that he had told Marx that it would be sufficient justification for a jail deputy to use force on an inmate based on the deputy's perception that the inmate was ready to attack, that he had embellished his knowledge of uses of force, that he had told Marx he had, or wanted to, use a flashlight to strike an inmate without needing to do so, or that he told Marx he did not care if an inmate killed another inmate. It was not until the federal criminal trial that this information was disclosed.

As the trial court noted, the ICIB investigators asked Courson both specific and open-ended questions about his communications with Marx, and yet Courson did not disclose that he made the statements that would later be the basis for the disciplinary action. Courson informed the investigators that he had told them everything he remembered about his communications with Marx. The investigators asked Courson whether he had ever witnessed any incidents or behavior by personnel at MCJ "that could be construed as or looked upon as civil rights violations" or "brutality," and whether he had witnessed anything illegal, and Courson responded "No."

The trial court further found that Courson "did not disclose any information that could suggest he made the allegedly exaggerated statements at issue in the [n]otice of [s]uspension, including about an 'unwritten rule' to send inmates to the hospital." This finding is supported by substantial evidence.

---

*Advertising v. Superior Court* (2011) 196 Cal.App.4th 866, 868 & fn. 1.)

Nothing that Courson disclosed to the investigators suggested that he made inaccurate statements to Marx or that he claimed that any illegal behavior had taken place at MCJ. Courson argues that the disclosures he admitted making to Marx—giving her information about use of force incidents and providing her a copy of the defensive tactics manual—were "red flags which would cause one to investigate further what other use of force policies or customs he might have unwittingly disclosed." This argument fails because the discipline was based on statements by Courson that were inaccurate or lacked context, and nothing he disclosed on August 30, 2011, suggested this type of behavior by Courson. There simply was nothing at that time that rose to the level of an "allegation of misconduct." (*Pedro, supra*, 229 Cal.App.4th at p. 106.)

Citing *Fox v. Ethicon Endo-Surgery, Inc., supra*, 35 Cal.4th at p. 808, Courson argues that the Department had to overcome a presumption that its investigation would have uncovered the allegation of misconduct, and the Department could only rebut this presumption by showing " 'the inability to have made earlier discovery despite reasonable diligence.' "

This argument fails because, as the trial court properly concluded, the Department did not discover, with the exercise of reasonable diligence, the allegation of misconduct against Courson, prior to June 4, 2014. In other words, the Department was not under any obligation to investigate potential misconduct by Courson until June 4, 2014. As the Supreme Court concluded in *Fox*, the discovery rule requires a party "to conduct a reasonable investigation *after becoming aware of an injury*." (*Fox v. Ethicon Endo-Surgery, Inc., supra*, 35 Cal.4th at p. 808, italics added; see *Pedro, supra*, 229 Cal.App.4th at p. 104 [under the

discovery rule, a party must conduct "a reasonable investigation after becoming aware of or suspecting an injury caused by wrongdoing"].) Here, there was substantial evidence to support the trial court's finding that, on August 30, 2011, and any other time prior to June 4, 2014, the Department had no reason to suspect the "injury" that ultimately led to the disciplinary action.

Quoting from *Morris v. Williams* (1967) 67 Cal.2d 733, Courson also argues that "the evidence of the investigative efforts is in the Department's possession" and that therefore the Department " 'has the burden of going forward with the evidence on the issue although it is not the party asserting the claim.' " (*Id.* at p. 760.) This argument fails as the details of the Department's investigation of Courson are contained in the administrative record, which was equally available to Courson and the Department. Furthermore, Courson was aware of what he disclosed to the Department and what he knew.[9]

Courson argues that the manner in which the ICIB investigators interviewed him was not reasonable or effective because they did not adequately prepare, did not give him the type and amount of notice required by POBRA, and intimidated him.[10] The trial court concluded that the ICIB investigators acted with reasonable diligence and substantial evidence

---

[9] Courson argues that the investigators should have reviewed his e-mails with Marx, but the record does not contain any e-mails or references to the content of any e-mails. Furthermore, the investigators indicated they planned to review his e-mails and texts with Marx, and there is no evidence that they did not do so.

[10] Courson failed to raise these arguments to the trial court.

22

supports this finding.  Most importantly, the investigators asked questions, both specific and open-ended, which could have elicited from Courson information about the communications that ultimately led to the disciplinary action.  Courson did not disclose the information, however, and nothing that he did disclose suggested that he had made inaccurate or exaggerated statements to Marx.  At that time neither Courson nor the Department were aware of the recordings made by Marx, so Courson was the only available source for the Department to find out what he had said to Marx.  Courson suggests that the investigators should have interviewed Marx, but this was clearly not a viable option since they believed she was part of an FBI investigation of the Department.

In sum, the trial court correctly concluded that the Department did not discover, with the exercise of reasonable diligence, the allegation of misconduct against Courson prior to June 4, 2014, when Courson and Marx testified at the federal criminal trial and the Los Angeles Times published an article about their testimony.  Therefore, the notice provided by the Department that it was taking disciplinary action, which was served on Courson on June 1, 2015, was timely under Government Code section 3304, subdivision (d)(1).

## B.    The 30-day Suspension

Courson contends that the 30-day suspension issued by the Commission was an abuse of discretion because it was too harsh under the circumstances.[11]

---

[11] As mentioned above, in this appeal Courson does not challenge the factual findings made by the Commission in

" '[I]n a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion.' [Citations.]" (*Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, 217.) "Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 404; accord, *County of Los Angeles v. Civil Service Com. of County of Los Angeles* (2019) 40 Cal.App.5th 871, 877 ["The court may not substitute its own judgment for that of the Commission, nor 'disturb the agency's choice of penalty absent " 'an arbitrary, capricious or patently abusive exercise of discretion' " by the administrative agency' [citation], but must uphold the penalty if there is any reasonable basis to sustain it"].)

We review de novo whether the Commission abused its discretion in imposing a given penalty. (*Pasos v. Los Angeles County Civil Service Com.* (2020) 52 Cal.App.5th 690, 700.)

"[T]he overriding consideration . . . is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence. [Citation.]" (*Skelly v. State Personnel Board*, *supra*, 15 Cal.3d at p. 218; accord, *Pasos v. Los Angeles County Civil Service Com.*, *supra*, 52 Cal.App.5th at p. 701 [quoting *Skelly*].) Discipline can be

---

support of the suspension, nor its conclusion that he had violated the Department's policies.

24

justified to "preserve [an agency's] image in the community." (*Pegues v. Civil Service Com.* (1998) 67 Cal.App.4th 95, 107.)

We conclude that the Commission's decision to impose a 30-day suspension on Courson was not an abuse of discretion. Courson's statements to Marx, which were made public at the federal criminal trial and in the media, caused harm to the public service because they cast Courson and the Department in a negative light. For example, Courson's statements to Marx and his testimony at trial suggested that he had been taught by the Department's training staff about the "unwritten rule," but during the administrative proceeding he admitted that in fact he had heard about the rule during a break in a training session and he did not recall who mentioned the rule.

Courson argues that he did not "cause[ ] 'harm to the public service' " because he "neither caused the FBI investigation, the Department's negative publicity, nor the obstruction trial during which Courson testified." This argument fails because the publicity surrounding Courson's statements added to the negative publicity regarding the Department. His statements also brought discredit to him personally, with obvious potential for impacting his effectiveness as a law enforcement officer.

With respect to the " 'circumstances surrounding the misconduct' " Courson points out that he "believed the relationship was purely social, he had no ax to grind with the Department in doing so, had no reason to believe his discussions were recorded, and was forthcoming and truthful with the Department." However, the fact remains that Courson made inappropriate statements to a law enforcement officer from a different agency, and did so in pursuit of personal goals. While Courson did disclose that he had communicated with Marx, and

25

he did cooperate in the Department's investigations, he did not voluntarily disclose his inaccurate statements, which only came to light because of the federal trial.

In conclusion, the Commission's imposition of a 30-day suspension was not an arbitrary, capricious or patently abusive exercise of discretion.

## DISPOSITION

We affirm the trial court's judgment in favor of the County on Courson's petition for writ of mandate and for extraordinary relief.  The County is awarded its costs on appeal.

NOT TO BE PUBLISHED

KELLEY, J.*

We concur:

ROTHSCHILD, P. J.

CHANEY, J.

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.